**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - **X**
                                                    :
**UNITED STATES OF AMERICA**
                                                    :
        **- v.-**
                                                    :        **S1 09-CR-1184 (RJH)**
**RAJ RAJARATNAM and**
**DANIELLE CHIESI,**                                :

            **Defendants**                          :

- - - - - - - - - - - - - - - - - - - - - - - - - **X**


### POST-HEARING MEMORANDUM IN SUPPORT OF DEFENDANT
### RAJ RAJARATNAM'S MOTION TO SUPPRESS WIRETAP EVIDENCE

John M. Dowd (admitted *pro hac vice*)
Terence J. Lynam (admitted *pro hac vice* )
Patricia A. Millett
James E. Sherry (admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave, NW
Washington, DC 20036
(202) 887-4000

Robert H. Hotz, Jr. (RH-4456)
Samidh Guha (SG-5759)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
(212)872-1000

*Attorneys for Raj Rajaratnam*

October 18, 2010
New York, NY

## TABLE OF CONTENTS

I.      INTRODUCTION............................................................................................................1

II.     FINDINGS OF FACT ....................................................................................................5

III.    ARGUMENT.................................................................................................................29

    A.    The Government Knowingly and Recklessly Made False Statements
      and Material Omissions in the Wiretap Affidavit............................................30

    B.    The Government's *Post Hoc* Justifications for Omitting Key Facts
      from the Affidavit Are Irrelevant, Incredible, and Contrary to the
      Evidence..............................................................................................................34

    C.    The Government's False Statements and Omissions Were Material ..............41

    D.    The Government Intentionally and Recklessly Omitted Facts
      Concerning Roomy Khan Material to its Showing of Probable Cause...........47

IV.     CONCLUSION .............................................................................................................49

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Franks v. Delaware*,
    438 U.S. 154 (1978)……………………………………………………………3, 34, 50

*In re Application for Interception of Wire Communications*,
    2 F.Supp.2d 177 (D.Mass. 1998)…………………………………………………………..37

*United States v. Aileman*,
    986 F. Supp. 1228 (N.D. Cal. 1997)……………………………………………...37, 44-45

*United States v. Aviles*,
    170 F.3d 863 (9th Cir. 1999)……………………………………………………………..37

*United States v. Blackmon*,
    273 F.3d 1204 (9th Cir. 2001)…………………………………………………………..33, 45

*United States v. Castellanos*,
    820 F. Supp. 80 (S.D.N.Y. 1993)……………………………………………………………...34

*United States v. Curreri*,
    388 F. Supp. 607 (D. Md. 1974)…………………………………………………………41

*United States v. Di Re*,
    332 U.S. 581 (1948)……………………………………………………………………...40

*United States v. Hoffman*,
    832 F. 2d 1299 (1st Cir. 1987)………………………………………………………...43

*United States v. Ippolito*,
    774 F.2d 1482 (9th Cir. 1985)………………………………………………………………43

*United States v. Khan*,
    415 U.S. 143 (1974)……………………………………………………………………...36

*United States v. Lilla*,
    699 F.2d 99 (2d Cir. 1983)………………………………………………………………33

*United States v. Reilly*,
    76 F.3d 1271 (2d Cir. 1996)……………………………………………………………...32

*United States v. Scrushy*,
    366 F. Supp. 2d 1134 (N.D. Ala. 2005)………………………………………………35, 38

*United States v. Stringer,*
   535 F.3d 929 (9th Cir. 2008)...................................................................2, 38

*Whiteley v. Warden, Wyo. State Penitentiary,*
   401 U.S. 560 (1971).......................................................................................44

**STATUTES**

18 U.S.C.
   § 2518(1)(c)................................................................................................36, 41
   § 2518(d)...........................................................................................................4

**OTHER AUTHORITIES**

17 C.F.R. §275.204-2..........................................................................................5

S. REP. NO. 90-1097 (1968)...............................................................................36

Webster's Third New Int'l Dictionary (2002).....................................................4

## I. INTRODUCTION

In ordering the *Franks* hearing, this Court explained that, "particularly in light of what [Agent Kang's March 7, 2008] affidavit did say," the repeated omission from the affidavit of the existence "of a lengthy SEC investigation," any reference to the four million documents produced by Galleon "all of which the government apparently had access to," or acknowledgement of the witness interviews and sworn depositions "the transcripts of which were apparently available to the government," constituted a substantial preliminary showing that the government had acted knowingly or recklessly in withholding information that "appear[s] material to Judge Lynch's determination that a wiretap was justified in this case."   08/12/10 Order at 4.   The record created in the *Franks* hearing now confirms that the truth and the affidavit are irreconcilable.   The necessity allegations of the affidavit were false and misleading, and materially so.   Indeed, former-AUSA Lauren Goldberg admitted that significant portions of the necessity section were "boilerplate" in no way tailored to the factual reality of what the FBI did do, did not do, and could have done in this case.   And those misrepresentations sit at the core of the necessity determination.   To illustrate:

- Agent Kang told Judge Lynch that a wiretap was needed because the "locations where the target subjects currently maintain records related to the scheme have not been fully identified, *if at all*."   The hearing established that, when he said that, he knew that the FBI had at its fingertips more than four million records related to stock trading, including Mr. Rajaratnam's instant messages ("IMs") and emails, but he hid that from Judge Lynch. Most importantly, he withheld from Judge Lynch that neither he nor anyone else at the FBI or USAO had taken the time to review all those documents or even look carefully at the records compiled for them by the SEC.   Those false statements and omissions were material because no reasonable judge could determine that relevant documents are missing (such as the government's alleged "faxes") – and thus that a wiretap is needed to find them – if the government admits it has not yet looked at all the documents it has.

- Agent Kang told Judge Lynch that trading records could not be obtained from securities clearing firms because "they sometimes alert traders to the request," which would "jeopardize the investigation."   At the time he made that statement, Agent Kang knew that some 221 document requests and/or grand jury subpoenas for trading records had

1

been made to securities clearing firms and other third parties without any adverse impact
on the investigation or any documented problem of non-compliance.

- Agent Kang told Judge Lynch that it would be "too risky" to interview witnesses because
it would "compromise the entire insider trader investigation." When he said that, Agent
Kang and Ms. Goldberg knew that they had in their possession the interviews or sworn
deposition testimony of 23 Galleon employees, including two interviews and a seven-
hour deposition of Mr. Rajaratnam, that Goldberg had not yet read "cover to cover." He
also knew that, without any impairment of the investigation, Mr. Rajaratnam and the
other deposed employees had been expressly warned that their testimony could be
provided to criminal authorities, which made "the possibility of criminal investigation
* * * [so] well known" that it put them on notice of the need to invoke the Fifth
Amendment if they wished to preserve that right. *United States v. Stringer*, 535 F.3d 929,
940-41 (9th Cir. 2008). Indeed, Agent Kang admitted on the stand that SEC interviews
could jeopardize some investigations, but nevertheless almost all SEC interviews and
depositions went forward without FBI objection. He also knew, but withheld from Judge
Lynch, that Mr. Rajaratnam had previously been interviewed by FBI agents on a different
criminal investigation and that Mr. Rajaratnam had voluntarily appeared and answered all
of the FBI's questions without any evidence that the investigation was impaired. The
boilerplate claim of necessity advanced in the affidavit thus was false and material
because it withheld from the Court both the existence of unstudied interview and
deposition records, as well as the fact that the FBI had determined that many interviews
could go forward without imperiling the investigation.

- Agent Kang told Judge Lynch that "the issuance of grand jury subpoenas likely would not
lead to the discovery of critical information and undoubtedly would alert the TARGET
SUBJECTS to the pendency of this investigation." At the time he said that to the Court,
Agent Kang knew that dozens of grand jury subpoenas had already been issued to third
parties without in any way compromising the investigation or alerting the target subjects.

- Agent Kang told Judge Lynch that physical surveillance was not viable. But he knew that
SEC investigators had been on-site at Galleon for months. In addition, the attempted
surveillance described in the affidavit was not a concerted law enforcement effort but,
instead, was a slapdash effort mouthing a makeweight excuse scripted in advance by the
Justice Department's Office of Enforcement Operations ("OEO").

Each of those false statements was material because establishing necessity requires

disclosing the conventional techniques actually available and actually used so that the issuing

judge can decide whether any of those conventional techniques could be employed effectively

before resort to the exceptionally intrusive technique of wire surveillance. Necessity is thus a

serial process of eliminating alternative options (not A, not B, not C), in contrast to probable cause, which rests on a cumulative compilation of facts (A + B + C).

Accordingly, once the falsehoods and material omissions in the Kang affidavit are corrected, the "remaining content" of the affidavit, *Franks v. Delaware*, 438 U.S. 154, 156 (1978), does not and cannot establish necessity. Indeed, had Agent Kang truthfully stated that all the FBI has done is passively receive information from the SEC, not all of which has even been read or analyzed by the FBI or USAO, "run some names through a database," and issue a handful of grand jury subpoenas, no reasonable judge would have concluded that a wiretap was necessary at that juncture. That is for the simple reason that a wiretap cannot be necessary when the government has not even read the documents, witness depositions and interviews, and trading records made available to it. Nor is it necessary when grand jury subpoenas are successfully working. And it certainly is not necessary when no effort has been made to interview and perhaps obtain the cooperation of insiders identified on the face of the records provided.

The government's argument that the SEC investigation was not a "law enforcement technique" is sheer gamesmanship. But reading evidence actually provided to an FBI agent from "cover to cover" *is* the most conventional and traditional law enforcement technique there is. So is following up on the leads those documents provide, as well as taking the time to do truly independent investigative steps and analysis without being spoon-fed by the SEC. Furthermore, just as asking a court for a search warrant is a traditional investigative method, asking other agencies for information in their lawful possession and available to them (whether immigration records or state law enforcement records) is a routine and commonplace investigative method.

Finally, it speaks volumes that "[i]t never crossed my mind" was the constant (and curiously uniform) refrain of the government's witnesses throughout the *Franks* hearing. The

3

witnesses admitted that they knew that Title III, and the Fourth Amendment principles it enforces, mandate a "full and complete statement as to whether or not other investigative procedures have been tried" or are "unlikely to succeed if tried," 18 U.S.C. § 2518(d). No one professed ignorance of what "full" or "complete" means. *See Webster's Third New Int'l Dictionary* (2002) ("full" means "containing all details"; "complete" means "possessing all necessary parts, items, components, or elements; not lacking anything necessary"). The witnesses also acknowledged that their full, complete, and truthful discussion of the conventional techniques used and available to the government was essential to permit the authorizing judge to discharge his constitutional duty to provide genuinely independent, informed, and impartial review before unleashing this extraordinarily intrusive form of police surveillance.

Thus, what "never crossed their minds" was letting *Judge Lynch* actually make a fully informed decision about whether a wiretap was necessary. It was so much easier for the FBI and USAO to decide for themselves what he should hear about and what should be hidden. It was so much more efficient to unilaterally determine and rewrite what the law required – creating an atextual exception to disclosure for information obtained or obtainable from an agency not under the FBI's exclusive "direction" and "control," rather than respect Congress's command of a "full and complete" disclosure. And it was so much easier to deliberately employ categorical and admittedly "boilerplate" recitations of necessity rather than explain to Judge Lynch the reality that the FBI and USAO simply preferred wiretaps to the hard work of reading the piles of documents at their fingertips, of actually reviewing interviews and sworn depositions "cover to cover," of following up on witnesses and leads apparent on the face of existing records, or of doing anything more than "receiving documents from the SEC," "running some names through a database," and issuing some grand jury subpoenas. Easier, yes. But constitutional? No.

4

## II. **FINDINGS OF FACT**

Based upon the evidence submitted during the *Franks* hearing, Mr. Rajaratnam respectfully submits that the Court should make the following findings of fact:

### **Mr. Rajaratnam and Galleon**

1.       Galleon registered with the SEC in January 2006 pursuant to the Investment Advisors Act of 1940. At the time, Galleon was not legally required to register with the SEC, but did so in anticipation of the law changing to require registration. Tr. at 45-46, 59-61, 78. By registering, Galleon became subject to the SEC's recordkeeping requirements for investment advisors and to examination by the SEC staff upon notice. *See* 17 C.F.R. §275.204-2. Those regulations required Galleon to preserve various categories of documents for five years after their creation, including all written communications concerning securities transactions, such as emails, IMs, and chat room posts, and complete records of all securities transactions. *See id.*; Tr. at 46, 59-61. Galleon retained and preserved all required records.

2.       Mr. Michaelson, Agent Kang, and Ms. Goldberg were each aware that Galleon registered with the SEC as an investment advisor and, that, as a consequence of registration, Galleon was subject to the SEC's recordkeeping requirements. Tr. at 111-12, 531, 730-31.

### **The Government's Investigation of Mr. Rajaratnam Between 1998 and 2002**

3.       The FBI began investigating Roomy Khan in late 1998 after receiving a complaint from her employer, Intel, that she had misappropriated certain confidential corporate information and faxed it to Galleon's New York office. Michaelson Ex. 6 at 2-3; Tr. at 618-19. Beginning in April 1999, FBI agents met with Khan on a number of occasions to question her about suspected insider trading with Mr. Rajaratnam and others. MTS Exs. A.7, A.8, & A.9; Michaelson Ex. 5. On February 28, 2001, the government filed a Criminal Information with the U.S. District Court

for the Northern District of California charging Khan with a single count of wire fraud in violation of 18 U.S.C. § 1343. Michaelson Ex. 4.

    4.    On April 2, 2001, Khan entered into a plea agreement by which she pled guilty to wire fraud and agreed to cooperate with the government's investigation. MTS Ex. A.4 ¶¶ 1-2. In return, the government promised to forgo charging Khan with any additional offense and to recommend a reduction in her sentence if she "provided substantial assistance to law enforcement authorities" in the investigation or prosecution of another person. *Id.* ¶¶ 8-9, 16.

    5.    Over the next seventeen months, Khan met repeatedly with SEC investigators, FBI agents, and prosecutors from the United States Attorney's Offices for the Northern District of California and Eastern District of New York. Michaelson Ex. 6 at 6-8. During those interviews, Khan claimed that she had provided Mr. Rajaratnam with confidential Intel financial information on several occasions since 1997, and that Mr. Rajaratnam had offered to pay her for it. MTS Exs. A.8 at 2-3 & A.9 at 1-2; Michaelson Ex. 5 at 1-3. Khan also claimed that Mr. Rajaratnam had bragged about his other sources of inside information, including an executive at Xilinx and an unnamed individual at Intel. *See* MTS Exs. A.8 at 3 & A.9 at 2; Michaelson Ex. 5 at 1-3. Khan also told the investigators that the information she provided to Mr. Rajaratnam was "trivial" and largely available from public sources. MTS Ex. 9 at 1.

    6.    In April 2002, the government moved for a reduction in Khan's Guidelines-range sentence. The government's sentencing memorandum stated that, "[a]fter an exhaustive analysis of the labyrinth of accounts associated with Galleon," Mr. Rajaratnam "[could] not be tied to illegal insider trading" and he "did not provide any monetary payment" for the information Khan allegedly provided him. Michaelson Ex. 6 at 3, 7. The government further stated that "[t]he FBI and SEC investigation into Rajaratnam's activities [was] continuing" and that it would continue

6

to pursue "several leads [Khan] provided with respect to other sources of information for Rajaratnam." Michaelson Ex. 6 at 3, 7.

7.     Mr. Michaelson, Agent Kang, and Ms. Goldberg all testified that they became aware of Khan's prior conviction in or around June 2007, and that they were aware that the prior conviction arose out of an investigation that also involved Mr. Rajaratnam. No one from the SEC, FBI, or USAO had actually reviewed the entire California case file, however, until after the wiretap authorization. Tr. at 100-04, 622, 687-88, 756-60.

## SEC Investigation Between 2003 and 2005

8.     The SEC issued a formal order of investigation captioned *In the Matter of Galleon Management, L.P.* (HO-9809) on November 5, 2003. One of the purposes of the investigation was to determine whether Galleon or others had "effected transactions in securities while in possession of material nonpublic information" or "conveyed, or caused to be conveyed, such material nonpublic information to other persons associated with Galleon who thereafter effected transactions in securities." Beaudreault Ex. 4; Michaelson Ex. 7; Tr. at 32-33, 104-07.

9.     The SEC served Galleon with five subpoenas *duces tecum* between November 6, 2003 and May 24, 2004. Beaudreault Exs. 2-1, 2-2, 2-3, 2-4, 2-5; Tr. at 32-33, 109-10. Those subpoenas sought: (a) records of all Galleon accounts; (b) records identifying all Galleon traders and investors; (c) records of all incoming and outgoing telephone calls; (d) records of all transactions in 25 different securities, (e) records reflecting Galleon's policies and procedures for oversight of employees' trading in securities; and (f) records reflecting communications (including emails and IMs) between Galleon employees and third-parties concerning specified secondary offerings. Beaudreault Exs. 2-1, 2-2, 2-3, 2-4, 2-5; Tr. at 32-33.

7

10.     Each of those subpoenas *duces tecum* enclosed an SEC Form 1662 that, among other things, expressly warned that the information provided may be used in a criminal proceeding and that, if there is any indication of a criminal violation of law, the information provided may be referred to criminal authorities. Beaudreault Exs. 2-1, 2-2, 2-3, 2-4, 2-5.

11.     On September 29, 2005, Galleon and Mr. Rajaratnam also received a request from the SEC seeking authorization for Bloomberg to release to the SEC all Galleon IMs sent or received between November 1, 2003 and June 30, 2005. Mr. Rajaratnam executed the requested authorization on October 27, 2005. Beaudreault Ex. 5; Tr. at 34-35.

12.     In addition to the subpoenas and requests that Galleon received pursuant to the 2003 formal order, Galleon received subpoenas *duces tecum* and informal document requests from the SEC in connection with other formal and informal investigations between 2005 and 2006, including: (a) a subpoena *duces tecum* in *In the Matter of the Benchmark Co. LLC* (NY-7470) on October 5, 2005; and (b) an informal request for documents in *In re James Horvath* (NY-07409A) on November 30, 2005. Beaudreault Exs. 2-7, 2-8; Tr. at 35. Those subpoenas and document requests required the production of, among other things: (a) records of trades in specified securities; and (b) records concerning Galleon's policies and procedures for the handling and treatment of material nonpublic information. *See* Tr. at 34-35.

13.     Ms. Beaudreault testified that Galleon complied fully with the subpoenas and informal requests that it received from the SEC between 2003 and 2005. Tr. at 30. The government offered no evidence to contradict Ms. Beaudreault's testimony in this regard.

**The SEC Sedna Formal Investigation in Late 2006**

14.     The SEC issued a formal order of investigation captioned *In the Matter of Sedna Capital Management, LLC* (NY-07665) on September 21, 2006. An announced purpose of the

8

Sedna investigation was to determine whether Sedna or others had "executed trades in certain securities on the basis of material, non-public information." Another purpose of the investigation was to determine whether Sedna or others had allocated profitable trades to accounts in which Sedna employees, their friends, and family were invested, a practice known as "cherry-picking." Michaelson Ex. 1-A; Tr. at 92-94.

15.     At the time of the formal order, Sedna was a hedge fund that had no formal affiliation with Mr. Rajaratnam or Galleon. Mr. Rajaratnam's brother, Rengan, was a founder and co-principal of Sedna, and Mr. Rajaratnam was a Sedna investor. Tr. at 27. Sedna was also represented by the same outside counsel as Galleon, including Ms. Beaudreault. Tr. at 79. Although the Sedna investigation was initially focused on possible cherry-picking and insider trading by individuals at Sedna, the primary focus of the Sedna investigation became suspected insider trading by Mr. Rajaratnam and others at Galleon. Tr. at 94.

16.     Andrew Michaelson, an attorney in the SEC's Division of Enforcement, was assigned to the Sedna/Galleon matter in November 2006 and led the investigation until he was detailed to the USAO in April 2008 to assist in prosecuting this case. Tr. at 91. Once assigned to the Sedna/Galleon investigation, Mr. Michaelson checked the SEC's databases and confirmed that none of the SEC's prior investigations of Galleon and Mr. Rajaratnam had resulted in charges or in the taking of record testimony. Tr. at 100-01, 107-08, 110. Mr. Michaelson did not, however, examine any of the subpoenas that had been issued in connection with the earlier investigations, did not determine whether any witnesses had been interviewed in connection with the earlier investigations, and did not review any of the documents produced in response to the SEC's earlier subpoenas. Tr. at 104, 106-11.

9

**SEC Conducts Field Examination of Galleon Between January and May 2007**

17.     In January 2007, the SEC's Office of Compliance Inspections and Examinations (OCIE) notified Galleon of its intent to conduct an on-site examination. Beaudreault Ex. 2-9; Tr. at 35-36, 112-20, 367. The OCIE staff conducted that on-site examination between February and May 2007, during which a team of four or more examiners was on-site at Galleon's offices and had access to all Galleon records, files, and employees. Tr. at 35-36, 112-120, 367. Mr. Michaelson testified that the OCIE examination was a "soup-to-nuts" examination of Galleon's compliance with the federal securities laws, including the insider trading laws. Tr. at 113.

18.     The OCIE staff served Galleon with 18 separate requests for documents, seeking, *inter alia*: (a) complete records of trades in all securities; (b) a list of public companies in which Galleon investors served as officers or directors; (c) a list of Galleon's most profitable trading positions; (d) a list of all soft-dollar arrangements with consultants and other third parties; (e) a list of all securities placed on Galleon's restricted list; (f) all emails and IMs sent and received by specified employees, including Mr. Rajaratnam, during specified periods; (g) a list of all third-party consultants; (h) lists of all investors in specified Galleon funds; (i) Galleon analyst reports; (j) logs of all facsimile transmissions sent or received during specified periods; (k) Galleon telephone directory and records of all incoming and outgoing telephone calls; and (l) complete accounting and financial records. Beaudreault Exs. 2-9 through 2-27; Tr. at 35-36, 112-20, 367.

19.     The OCIE staff also interviewed numerous Galleon employees, including Mr. Rajaratnam. Tr. at 29, 45, 119. The OCIE staff's notes of many of these interviews were received into evidence at the *Franks* hearing. Michaelson Ex. 27-A; Government Exs. 153-58.

20.     Mr. Rajaratnam was first questioned by the OCIE staff on February 12, 2007, and was interviewed a second time on March 9, 2007. Beaudreault Exs. 12, 14; Michaelson Ex. 27-

A; Tr. at 45-47, 49-52, 150-153, 369-371. During those interviews, the OCIE staff questioned Mr. Rajaratnam about a number of matters pertinent to the SEC's insider trading investigation, including: (a) Mr. Rajaratnam's relationships and communications with corporate insiders; (b) Mr. Rajaratnam's positions on outside boards of directors; (c) the role of Galleon analysts in developing trading strategies; (d) the purpose and function of Galleon's restricted list; and (e) Mr. Rajaratnam's ten most profitable trading positions. Mr. Rajaratnam answered every question posed to him during both interviews. Beaudreault Exs. 12 & 14; Michaelson Ex. 27-A; Tr. at 50, 52, 151. In response to questions, Mr. Rajaratnam identified Rajiv Goel as a friend and Wharton Business School classmate who was employed by Intel. Beaudreault Ex. 14; Michaelson 27-A; Tr. at 51, 152. The OCIE staff also followed Mr. Rajaratnam's March interview with additional document requests about matters that Mr. Rajaratnam raised during the interview. Beaudreault Ex. 2-17; Tr. at 52, 153.

21.     Mr. Michaelson testified that he was aware of the OCIE's examination of Galleon and that he communicated with the OCIE staff about it as it was occurring. Mr. Michaelson was aware that the examiners were permitted to inspect documents on-site at Galleon and knew that the staff were given space at Galleon's offices in which to work. Mr. Michaelson was also aware that the OCIE staff was interviewing witnesses, including Mr. Rajaratnam, and was aware of the substance of the OCIE staff's requests for documents. Mr. Michaelson testified that Galleon produced "a lot" of documents in response to the requests, and acknowledged that he had access to those documents for his formal insider trading investigation. Tr. at 118. Mr. Michaelson also testified that the OCIE staff would bring to his attention evidence that pertained to the formal insider trading investigation. Tr. at 112-20.

11

22.     Agent Kang and Ms. Goldberg also testified that they were aware of the OCIE examination of Galleon and knew that the examiners had obtained documents from Galleon and had interviewed Galleon employees, including Mr. Rajaratnam. Tr. at 508-12, 731. Agent Kang and Ms. Goldberg testified that they were not aware of the substance of the interviews and never asked to review the examiners' notes, although they had full access to all SEC files and could have done so upon request. Tr. at 508-12, 731.

**Referral of Case to Criminal Authorities in March 2007**

23.     In late March 2007, SEC attorneys brought their formal investigation of Sedna, Galleon, and Mr. Rajaratnam to the attention of the USAO and FBI. Kang Ex. 3; Tr. at 95, 485.

24.     On March 26, 2007, the USAO and FBI formally requested access to the SEC's investigative file in the Sedna/Galleon matter. Michaelson Ex. 12. The SEC granted the request. Michaelson Ex. 13. The witnesses all testified that the SEC gave the FBI and USAO full access to any and all records in its files pertaining to its insider trading investigation of Mr. Rajaratnam, including, without limitation, all documents and testimony obtained from Galleon, Sedna, Mr. Rajaratnam, and third parties. Tr. at 122-124, 486, 729-31. The grant of access also included all relevant evidence obtained by the OCIE staff during its on-site examination of Galleon. *Id.*

25.     No one from the USAO or FBI ever reviewed the SEC's complete investigative file. Instead, the USAO and FBI relied upon the SEC to identify, analyze, and forward relevant evidence that it obtained in its investigation. Tr. at 614, 685. The witnesses agreed, however, that the FBI and USAO could have obtained and inspected any evidence in the SEC's investigative file upon request. Tr. at 124, 486, 731-732.

12

26.     Representatives from the USAO, FBI, and SEC first met to discuss the case on March 29, 2007. Attendees included Mr. Michaelson, Agent Kang, AUSAs Brian Johnson, David Esseks, and Brian Coad, and SEC Attorney Sanjay Wadhwa. Kang Ex. 3; Tr. at. 485.

27.     Prior to or during this initial meeting, the SEC provided the USAO and FBI with a briefing book containing factual chronologies that the SEC had prepared, along with backup documentation for those chronologies. Kang Ex. 4; Tr. at 490-493. Those chronologies included summaries of the evidence of suspected insider trading by Mr. Rajaratnam and others in the securities of Arris and Advanced Micro Devices ("AMD"). Mr. Michaelson testified that he used these chronologies to keep track of the evidence that the SEC had gathered, including telephone records, trading records, IMs, and emails. Tr. at 124-129. The SEC would provide the FBI and USAO with other such chronologies on a number of occasions before March 7, 2008. Kang Exs. 4, 21, & 22; Michaelson Exs. 19, 94, 96, 97, 98 103, 106, & 120. Mr. Michaelson provided these chronologies so that the FBI and USAO "wouldn't have to recreate the wheel." Tr. at 132.

28.     Agent Kang's notes and memorandum of the March 29, 2007 meeting also reflect discussion of the OCIE's field examination of Galleon, the SEC's plan to serve additional document subpoenas on Galleon, and the scheduling of testimony of Sedna trader William Lyons. Kang Exs. 3 at USA-FH-00207 & 5 at USA-FH-00189. Mr. Michaelson testified that, once the criminal authorities became involved in the investigation, the SEC would routinely check with the FBI and USAO before interviewing a witness to determine if the criminal authorities had any objection. Tr. at 135.

29.     Following this initial meeting, representatives from the SEC, USAO, and FBI met in person or on conference calls on at least 19 other occasions before March 7, 2008. Agent Kang memorialized each of the meetings and conference calls with a memorandum to his file.

13

These memos reflect that the SEC provided the USAO and FBI with regular updates on the status of its insider trading investigation and forwarded to the USAO and FBI documentary and testimonial evidence that it considered particularly important to the investigation. Michaelson Exs. 77 & 116; Kang Exs. 3, 6, 7, 10, 11, 13, 14, 15, 17, 18, 20, 21, 23, 24, 25 & 27.

30.    The SEC also regularly provided the USAO and FBI with information relevant to the investigation via email, letter, and facsimile. A number of these communications were received into evidence at the *Franks* hearing. Michaelson Exs. 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 24-A, 25, 72, 75, 76, 78, 79, 81, 82, 83, 85, 86, 87, 88, 89, 90, 91, 92, 191, 102, 102, 104, 107, 108, 108-A, 112, 113, 114, 115, 119, 122, 124, 125, 126, 127, 128 & 129.

### Document Subpoenas to Galleon and Mr. Rajaratnam's Testimony in May-June 2007

31.    On April 16, 2007, Mr. Michaelson sent Galleon a letter instructing it to preserve all records of any kind created on or after January 1, 2006. Michaelson Ex. 31; Tr. at 160-61.

32.    On May 14, 2007, the SEC served Galleon and Mr. Rajaratnam with a subpoena *duces tecum* for various records and a subpoena for Mr. Rajaratnam's testimony. Beaudreault Exs. 2-28 & 2-29. The May 14, 2007 subpoenas enclosed SEC Form 1662 warning of the possibility of referral to criminal authorities. *Id.*

33.    The SEC met with the FBI and USAO on May 23, 2007. Kang Ex. 7. An agenda for this meeting prepared by Mr. Michaelson shows that the document subpoena to Galleon and Mr. Rajaratnam's scheduled SEC deposition were among the topics discussed at this meeting. Kang Ex. 8. Mr. Michaelson, Agent Kang, and Ms. Goldberg attended this meeting, along with others from the SEC, FBI, and USAO. Kang Ex. 7; Tr. at 500-01.

34.    In an email sent shortly after the May 23, 2007 meeting, Ms. Goldberg stated that the SEC, FBI, and USAO had "talked strategy" at the meeting regarding Mr. Rajaratnam's

14

deposition, specifically with respect to the subjects to be covered. Michaelson Ex. 26-A. Mr. Michaelson and Ms. Goldberg also both testified that the meeting discussed the subjects to be covered at Mr. Rajaratnam's deposition. Tr. at 139-45, 733-39. Mr. Michaelson testified that the meeting was a "dialogue" among the attendees. Tr. at 145. Agent Kang, however, recalled no discussion of Mr. Rajaratnam's testimony beyond being notified by the SEC that the deposition had been scheduled. Tr. at 505-07.

35.     Mr. Michaelson took Mr. Rajaratnam's sworn testimony for seven hours on June 7, 2007. Mr. Michaelson testified that he was free to inquire about any subject and that there were no restrictions placed on his questioning by Galleon, Mr. Rajaratnam, the FBI, or the USAO. Michaelson Ex. 45; Tr. at 183, 190. Mr. Michaelson advised Mr. Rajaratnam at the beginning of the deposition that his testimony concerned possible criminal violations of law and could result in a referral to criminal authorities. Mr. Rajaratnam stated on the record that he understood this warning. Tr. at 54-55; 162-163.

36.     During the deposition, Mr. Michaelson asked Mr. Rajaratnam a number of questions relevant to the government's ongoing insider trading investigation, including: (a) whether Mr. Rajaratnam understood what insider trading was and whether he believed it was wrong; (b) whether certain hypothetical information would be considered "material"; (c) questions about Galleon's restricted list and an instance in which Mr. Rajaratnam placed a stock on the restricted list; (d) questions about Roomy Khan (later named as a co-conspirator) and Mr. Rajaratnam's IM correspondence with her, including IMs in January 2006 concerning Polycom; (e) questions about a meeting between Mr. Rajaratnam and Hector de Ruiz, then the CEO of AMD; (f) questions about Ali Far (later named as a co-conspirator); and (g) questions about Mr. Rajaratnam's trading in various stocks, including AMD, ATI, Google, and Xilinx.     Mr.

15

Rajaratnam answered every question posed during the deposition. Michaelson Ex. 45 at 50, 66, 71, 73-74, 77-84, 98-125, 131-145, 152-154, 155, 157-173.

37.     Mr. Michaelson testified that, based on information provided by Mr. Rajaratnam at the deposition, he expanded the number of stocks and transactions under review in the insider trading investigation. Tr. at 251. The SEC also served follow-up subpoenas *duces tecum* on Galleon and Mr. Rajaratnam on June 8, 2007. Beaudreault Exs. 2-30, 2-31; Tr. at 187-89.

38.     Mr. Michaelson provided Agent Kang, Ms. Goldberg, and others at the FBI and USAO with the transcript of Mr. Rajaratnam's testimony shortly after the deposition was taken. Michaelson Ex. 45. Agent Kang testified that he read the entire transcript. Tr. at 507. Ms. Goldberg testified that she read most of it, but may not have read it "cover to cover." Tr. at 740.

39.     Between late 2006 and mid-2007, the SEC took sworn, on-the-record testimony from five other individuals in connection with the Sedna/Galleon investigation. Michaelson Exs. 46 - 50; Tr. at 190-92. The SEC provided the FBI and USAO with the transcripts of every one of these depositions. Michaelson Exs. 51 & 72; Tr. at 190-92.

40.     Galleon produced more than four million pages of documents in response to the SEC's May 14 and June 8, 2007 subpoenas. Tr. at 35-36, 38-44; 163-80, 187-89. The documents produced by Galleon included 276,000 emails and 46,000 pages of IMs, including emails and IMs to and from Mr. Rajaratnam. Galleon's production also included: (a) trading records; (b) a list of Galleon's investors; (c) documents reflecting Galleon's investment process and organizational structure; (d) contact lists from Mr. Rajaratnam's computer and cellular telephone; (e) Mr. Rajaratnam's computer hard drive; (f) documents concerning Mr. Rajaratnam's personal bank and brokerage accounts and credit card statements; (g) Mr. Rajaratnam's handwritten notes; and (h) Mr. Rajaratnam's calendar. Tr. at 39-40. Galleon's

16

production of these documents was in addition to its production of documents to the OCIE examination staff and to the SEC in response to subpoenas and requests received between 2003 and 2005.

41.     The documents produced by Galleon in response to the SEC's May 14 and June 8, 2007 subpoenas included emails, IMs, and contact information for a number of individuals who the government now alleges were sources of inside information for Mr. Rajaratnam, including Anil Kumar, Danielle Chiesi, Rajiv Goel, Roomy Khan, and Ali Far. Beaudreault Exs. 7-11; Michaelson Exs. 33 & 34; Tr. at 41-44, 163-69, 172-75.

42.     The witnesses all testified that the USAO and FBI had full access to all of the records produced by Galleon and could have reviewed any of them upon request. Tr. at 122-24, 486, 729-31. No one from the USAO or FBI ever reviewed all of the records. Instead, they chose to rely upon Mr. Michaelson and others at the SEC to identify and analyze the most important records. Tr. at 614, 685.

## SEC Third-Party Requests and Other Investigative Activity Before March 7, 2008

43.     The SEC also served at least 221 subpoenas *duces tecum* and informal requests for production on third parties as part of its insider trading investigation before March 7, 2008. Michaelson Ex. 52; Tr. at 195-97

44.     Third parties that received those document subpoenas or requests from the SEC included banks, brokerages, telephone companies, and issuers of securities. *See* Michaelson Exs. 53-61; Tr. at 197-220. Among the issuers that received document requests from the SEC before March 7, 2008 were AMD, Hilton, Polycom, Google, and Intel. *Id.*

45.     Agent Kang and Ms. Goldberg were aware that the SEC was requesting and obtaining documents from third parties, and agreed that the FBI and USAO could access any of

17

the documents obtained by the SEC upon request. Tr. at 122-24, 486, 729-31. However, no one from the FBI or USAO ever reviewed all of the documents that the SEC obtained from third parties, relying instead on the SEC to identify and analyze the most important documents. Tr. at 614, 685.

46.     The SEC prepared additional factual chronologies summarizing the evidence gathered of suspected insider trading in various securities by Mr. Rajaratnam and others, and continued to provide these chronologies to the FBI and USAO prior to March 7, 2008. Michaelson Exs. 19, 94, 96, 97, 98, 103, 106, and 120; Kang Exs. 4, 20, and 21; Tr. at 128, 264.

### Investigative Efforts by the USAO and FBI Before March 7, 2008

47.     Between March 29, 2007 and March 7, 2008, the FBI and USAO primarily relied upon the SEC to gather and analyze evidence relevant to the insider trading investigation of Mr. Rajaratnam.     Except in a few respects, the FBI and USAO did not investigate this case independently of the SEC during that period. Indeed, after obtaining the computers of Roomy Khan, the FBI asked the SEC to perform a forensic analysis of their contents, which the SEC did and provided to the FBI. Michaelson Ex. 116; Tr. at 286-88.

48.     Between March 29, 2007 and March 7, 2008, the FBI and USAO gathered financial and telephone records from a number of banks and telephone companies using grand jury subpoenas. Kang Exs. 34 & 35; Tr. at 574-76, 750. The FBI also interviewed two witnesses – Roomy Khan and her broker, Jeffrey Turnbaugh – before March 7, 2008. Tr. at 549-50, 573-74, 616. With Ms. Khan's consent, the FBI also recorded telephone calls between Ms. Khan and other individuals of interest, including Mr. Rajaratnam. Tr. at 662-64.

49.     The SEC asked the FBI to help with its own investigation by, *e.g.*, locating telephone information for the SEC. The FBI complied. Michaelson Ex. 116; Tr. at 136-37.

18

50.     During the *Franks* hearing, the Court asked Ms. Goldberg to describe "what the

substance of the U.S. Attorney's Office work was other than receiving information from the SEC

prior to the [wire]tap going up" in March 2008. Ms. Goldberg responded:

> "Certainly one part of the agent's work * * * along with the prosecutors – was reviewing
> information that we'd gotten from the SEC. So part of it is just getting familiar with that
> evidence, learning what it was they had, reviewing records. We independently obtained
> some of our own records, phone records, trading records, bank records. Whatever we
> obtained through grand jury subpoenas would supplement what the SEC had provided.
> The agents spent a lot of time putting together, just assimilating their own analyses of
> what all this information meant; trying to look at public announcements that were related
> to earnings announcements, whatever the critical events were that we thought surrounded
> different trades. There was a lot of research done on the different names that had come
> up. And as we got towards the – I guess late summer of 2007, early into the fall was
> when we started to put everything sort of together and trying to strategize about what our
> next step would be, which ultimately led to the decision to approach Ms. Khan. And then
> once Ms. Khan was approached, figuring out ways to utilize her cooperation to help
> advance the investigation which ultimately led to our decision that because of her
> assistance in making consensual calls with Mr. Rajaratnam, we were able to get up on a
> wiretap."

Tr. at 828-29.

## Mr. Rajaratnam's September 2007 Interview by FBI Agents in an Unrelated Criminal Case

51.     In September 2007, Mr. Rajaratnam was interviewed by FBI agents investigating

a counterterrorism matter unrelated to the insider trading investigation. Mr. Rajaratnam met with

these FBI agents voluntarily and without counsel, and answered all of their questions. Agent

Kang was aware, before March 7, 2008, of the fact that Mr. Rajaratnam had met with these FBI

agents voluntarily and had answered their questions. Kang Ex. 36; Tr. at 597, 686.

## Interviews of Roomy Khan In Late 2007 and Early 2008

52.     Based on IMs and other documents that Galleon produced in response to the

SEC's subpoenas and document requests in 2007, the SEC identified Roomy Khan as a potential

source of inside information for Mr. Rajaratnam on Polycom. Tr. at 263, 266, 365, 397, 400,

404.     Further investigation by the SEC, including document requests served on Polycom,

19

revealed that Khan had placed telephone calls to a Polycom insider and to Mr. Rajaratnam shortly before certain Polycom earnings announcements in 2005 and 2006. Michaelson Ex. 95; Kang Ex. 22; Tr. at 530. The SEC also determined that Khan had placed large trades in Hilton securities shortly before the announcement of Hilton's acquisition by Blackstone on July 3, 2007, and was investigating a group of individuals, including Mr. Rajaratnam, who had communicated with Khan and traded Hilton securities around that time. Michaelson 98; Kang 11 at USA-FH-0408, Kang 17 at USA-FH-0700; Tr. at 514, 530.

53.     In the late summer or early fall of 2007, the FBI and USAO made a decision to contact Roomy Khan and attempt to obtain her cooperation. Tr. at 573-74, 637, 750. Agent Kang and Ms. Goldberg testified that they decided to contact Khan in part because of the strength of the evidence gathered by the SEC, and in part because they were aware that she had previously cooperated with the government in connection with its insider trading investigation of Mr. Rajaratnam between 1998 and 2002. Tr. at 637, 750-51.

54.     Agent Kang, along with FBI Special Agent Kathleen Queally, first met with Khan on November 28, 2007. During that interview, Khan admitted that she sometimes exchanged trading ideas with Mr. Rajaratnam, but denied wrongdoing. MTS Ex. A.16.

55.     Agents Kang and Queally met with and interviewed Khan numerous additional times before March 7, 2008. Attorneys from the USAO and SEC, including Ms. Goldberg and Mr. Michaelson, were present for some of those interviews. MTS Exs. A.16, A.17, A.19; Michaelson Exs. 109, 110; Tr. at 278-80.

56.     After the November 28, 2007 interview, Khan told investigators that she had provided Mr. Rajaratnam with material, nonpublic information about Polycom and Google, and identified her sources of inside information at those companies. MTS Exs. A.16 & A.17;

20

Michaelson Exs. 109, 110; Tr. at 312.  Khan also claimed that she had acquired Hilton stock before its acquisition by Blackstone because Khan thought Paris Hilton's incarceration at the time would be "good publicity" for the company.  MTS Ex. A.17 at 10; Tr. at 311-12, 751-52.

57.    Agent Kang testified that he had "suspicions" about whether Khan was being completely truthful prior to March 7, 2008, especially in explaining the basis for her trading in Hilton stock in July 2007.  Tr. at 574.  Ms. Goldberg also doubted whether Khan was being completely truthful, stating in a February 16, 2008 email that "we're not convinced yet she [Khan] [i]s being completely truthful about other possible targets" besides Mr. Rajaratnam.  Ms. Goldberg testified that she believed Khan's allegations about Mr. Rajaratnam, while doubting whether Khan was being truthful about other matters.  Goldberg Ex. 17; Tr. 751-55.

58.    At the FBI's direction, Khan consensually recorded her telephone calls with a number of individuals, including Mr. Rajaratnam.  Tr. at 423, 662-63.  Based in part on recordings that Khan made in January 2008, the USAO and FBI decided that they had obtained sufficient probable cause to seek a wiretap on Mr. Rajaratnam's cellular telephone.  *Id.*

## Coordination of Investigative Efforts by the SEC, FBI, and USAO

59.    The evidence establishes that the SEC, FBI, and USAO worked closely together and coordinated their investigative efforts between March 29, 2007 and March 7, 2008.

60.    Following Mr. Rajaratnam's arrest on October 16, 2009, the USAO, FBI, and SEC held a joint press conference, during which U.S. Attorney Preet Bharara described the USAO, FBI, and SEC as "law enforcement partners in this case" and referred to the SEC as "terrific partners."  Michaelson Ex. 2.  SEC Director of Enforcement Robert Khuzami described the investigation as an example of "coordination" among the SEC, FBI, and USAO.  *Id.* at 3, 10, 15.  Mr. Michaelson agreed with Mr. Bharara's characterization of these agencies as "partners" in

this investigation and with Mr. Khuzami's description of the "coordination" among the SEC, FBI, and USAO. Tr. at 97-99. Mr. Michaelson also testified that the FBI, USAO, and SEC "were working closely together" on the investigation. Tr. at 99.

61.     Mr. Michaelson further testified that, while at the SEC, it was his "practice . . . to keep the criminal authorities up to speed on steps that [the SEC was] taking" so that the SEC would not "trip" the criminal authorities or "step on their toes or get in their way." Tr. at 132-33. In particular, Mr. Michaelson testified that "we [the SEC] would let them [the FBI and USAO] know before we interviewed someone for sure." *Id.* Mr. Michaelson agreed with counsel that the SEC, USAO, and FBI "were coordinating the contact of witnesses" and that this was "part of the coordination" among the SEC, FBI, and USAO that began in 2007. *Id.*

62.     When asked whether the government's insider trading investigation of Mr. Rajaratnam was "conducted as a joint investigation by the FBI, the United States Attorney and the SEC since March of 2007," Agent Kang answered: "We worked together on the case, yes." Tr. at 483. When asked whether he relied on the SEC, Agent Kang testified: "[T]he staff attorneys and Andrew [Michaelson] and others, they knew the case inside out. They were dedicated to the case. They knew more about the case than I did, obviously, at the time. A lot of SEC personnel were working on this case, so they really put effort into reviewing everything that they had and shared that information with us." Tr. at 614.

63.     Ms. Goldberg agreed that the FBI and USAO "work[ed] regularly with the SEC on this investigation," "received the benefit of [the SEC's use of] conventional investigative techniques," and "receiv[ed] the best of what the SEC could produce." Tr. at 758, 772, 827-28.

**Status of Investigation as of March 7, 2008**

64.     By March 7, 2008, the SEC had prepared and provided the FBI and USAO with detailed factual chronologies summarizing the evidence of suspected insider trading in the securities of: (a) Intel, around certain quarterly earnings announcements; (b) AMD, around the time of the announcement of a significant business transaction with Dell; (c) Polycom, around certain quarterly earnings announcements; (d) Hilton, around the announcement of its acquisition by Blackstone in July 2007; and (e) Xilinx, around certain quarterly earnings announcements. Kang Ex. 21; Michaelson Exs. 106 & 120; Tr. at 264-71, 275-76, 291-92, 538-43. The latest editions of these chronologies prior to the wiretap application indicated that the SEC still had a number of investigative steps on its "to do" list, including gathering additional records from Galleon and third parties. Michaelson Ex. 120; Tr. at 543.

65.     The SEC had also provided the FBI with other analytical work product, including: (a) a list of telephone numbers for numerous individuals of interest to investigators, including at least 10 people currently identified by the government as Mr. Rajaratnam's sources of inside information about various companies; (b) a chart showing "links/networks" among various individuals, including at least six people currently identified by the government as Mr. Rajaratnam's sources of inside information about various companies; and (c) a list of 29 different "issuers of interest" along with the identities of suspected sources of inside information for 17 of those companies.     The government had also identified a number of individuals whom it suspected were providing Mr. Rajaratnam with material, nonpublic information about various companies. Michaelson Exs. 83, 91, 128; Kang Ex. 30; Tr. at 603-605.

66.     By March 7, 2008, the government had identified Roomy Khan as Mr. Rajaratnam's suspected source of inside information on Polycom and Google, and had identified

23

Ms. Khan's suspected sources of inside information on these securities as well. Tr. at 263, 283-284. The government was also investigating Ms. Khan's relationship with Deep Shah, whom Khan would later identify as her source of inside information on the July 2007 Hilton acquisition. MTS Ex. A.19 at 2 ; Tr. at 536, 605.

67.     By March 7, 2008, the government had also identified Rajiv Goel as Mr. Rajaratnam's suspected source of inside information on Intel, and had obtained documents from Intel identifying the person whom the government now contends was Goel's source of inside information on Intel. Michaelson Exs. 97, 107, 128; Tr. at 312. The government had also identified a number of securities transactions in Mr. Goel's personal Charles Schwab brokerage account that originated from computers associated with Galleon internet protocol addresses. Tr. at 276-77.

68.     By March 7, 2008, the government had also identified Mr. Rajaratnam's suspected sources of material, nonpublic information on Xilinx, Juniper, @Road, and Cisco. Tr. at 556, 604-05.

69.     By March 7, 2008, the government was beginning to investigate a number of other individuals whom it now contends provided Mr. Rajaratnam with material, nonpublic information on various companies, including Danielle Chiesi, Anil Kumar, Zvi Goffer, and Ali Far. Tr. at 534-35, 604-05.

70.     By March 7, 2008, the government had in its possession sufficient evidence to identify Anil Kumar as a potential source of inside information for Mr. Rajaratnam with respect to AMD's acquisition of ATI in August 2006, a transaction the SEC was actively investigating due to Mr. Rajaratnam's profitable trading in ATI around the time of the announcement. In particular, the SEC had obtained: (a) Mr. Rajaratnam's Microsoft Outlook contacts, which

24

identified Kumar; (b) emails reflecting that Kumar was a partner at McKinsey who worked on matters for AMD; (c) telephone records reflecting frequent contacts between Mr. Rajaratnam and Kumar; (d) a Galleon investor list identifying Kumar as a person associated with accounts held in the name of Manju Das; and (e) a chronology prepared by AMD that identified Kumar as a person with inside information regarding AMD's acquisition of ATI. Beaudreault Exs. 6 & 7; Michaelson Exs. 35 & 70; Tr. at 220-21. Mr. Michaelson acknowledged that those documents were in the SEC's investigative file before March 7, 2008, but he "missed" the connection. Tr. at 220, 455-58. Agent Kang could not recall whether he reviewed Galleon's investor list before March 7, 2008, but acknowledged that he did not review all the documents that the SEC had obtained. Tr. at 501-02, 679-82, 685.

71.     By March 7, 2008, the SEC had also identified at least 12 individuals other than Ms. Khan as potential interviewees. Michaelson Ex. 84 at 2; Tr. at 256-58. The conventional investigation that the SEC, FBI, and USAO had been pursuing into these and other leads was continuing as of March 7, 2008. Tr. at 465.

72.     Although the FBI was dependent on the evidence that the SEC chose to send it and did very little independent investigation of its own, the FBI and USAO never consulted with the SEC about the need for a wiretap or the sufficiency of conventional investigative technique before March 7, 2008. Tr. at 465.

73.     Ms. Goldberg testified that the SEC's conventional investigation had "hit a bit of a wall" by March 7, 2008, and that this was why a wiretap was deemed necessary. Tr. at 814. This testimony is not supported, however, by any contemporaneous evidence, all of which indicates that the SEC had developed significant evidence using conventional means by March 7, 2008 and could continue to use those same conventional means to develop additional evidence

25

and pursue additional leads.  This testimony is also inconsistent with the fact that the FBI and USAO never consulted with Mr. Michaelson or the SEC about the need for a wiretap.

## Preparation of March 7, 2008 Wiretap Application and Affidavit

74.     Ms. Goldberg drafted the March 7, 2008 wiretap application and supporting affidavit.  Tr. at 723-24.  In doing so, she relied in part on earlier applications and affidavits submitted in connection with the government's investigation of Zvi Goffer and Craig Drimal.  Tr. at 724-25, 768-70.  Ms. Goldberg also testified that, in drafting the wiretap application and supporting affidavit, she relied in part on boilerplate language typically used by the USAO in its wiretap applications and affidavits.  Tr. at 793-94.    In particular, Ms. Goldberg testified that paragraphs 38 (Grand Jury) and 43 (Search Warrants) of the March 7, 2008 application consisted of boilerplate language, and that paragraph 40 (Witness Interviews) consisted of boilerplate language apart from the second sentence.  Tr. at 789-790.

75.     Ms. Goldberg testified that she prepared approximately 25 wiretap applications and affidavits during her service as an AUSA, mostly in narcotics cases, and that her usual practice was to take boilerplate language typically used in these applications and affidavits and "modify" it to the circumstances of the particular case in which a wiretap was sought.  Ms. Goldberg testified that she followed a similar procedure in preparing the March 7, 2008 application and affidavit.  Tr. at 793-794.

76.     To obtain the statutorily required authorization of the Department of Justice (18 U.S.C. §2516(1)), Ms. Goldberg submitted her draft affidavit to the OEO on February 27, 2008.  Goldberg Exs. 19 & 21; Tr. at 770-71.  That draft did not describe any attempts at physical surveillance of Mr. Rajaratnam, as none had yet been made.  Goldberg Ex. 21 at USA-FH-02452; Tr. at 768.  The draft affidavit also did not describe CS-1 (Roomy Khan) as "reliable."  *Id.*

26

77.     In emails to Ms. Goldberg on March 3, 2008, Michelle Swaney of the OEO commented on the draft affidavit, instructing Ms. Goldberg, *inter alia*, to describe CS-1 as "reliable."   Ms. Swaney did not ask Ms. Goldberg if Khan was actually reliable and Ms. Goldberg did not inform Ms. Swaney about her doubts as to Khan's veracity or her prior conviction.  Goldberg Ex. 20 at USA-FH-02515; Tr. at 768-69, 777.

78.     Ms. Swaney also instructed Ms. Goldberg to explain why no physical surveillance had been attempted, "since it's a fairly apparent omission."  Ms. Swaney added: "The point is to do whatever you can to avoid a future challenge for lack of necessity, e.g., FBI went straight to tapping the phone before exhausting the less intrusive alternative investigative technique of surveillance" because "this wire will likely be litigated more aggressively than the average drug wire, so the necessity section is particularly important."  Goldberg Ex. 20; Tr. at 775.

79.     Ms. Goldberg admitted that she did not inform OEO of the FBI's and USAO's year-long coordinated investigation with the SEC or of the SEC's use of conventional investigative techniques to gather documents from Galleon and obtain testimony from witnesses, including Mr. Rajaratnam.  Tr. at 777-79.

80.     Ms. Goldberg submitted a revised affidavit to OEO on March 5, 2007.  *See* Goldberg Ex. 22; Tr. at 779-780.  As requested by OEO, the revised affidavit described Khan as "reliable" and added information about the FBI's attempts to conduct physical surveillance of Mr. Rajaratnam.  The OEO approved this draft, which was submitted in substantially identical form to Judge Lynch on March 7, 2008.  *Compare* Goldberg Ex. 22 *with* Kang Ex. 1.

**Necessity Allegations in March 7, 2008 Wiretap Application and Supporting Affidavit**

81.     Paragraphs 12, 35, 38, 40, and 43 of the March 7, 2008 affidavit are substantially identical, save the names, to the corresponding paragraphs in an affidavit submitted to this Court

27

on February 11, 2008 in support of an application to wiretap a telephone used by Zvi Goffer. Ms. Goldberg testified that she copied certain portions of the Goffer wiretap affidavit for use in the March 7, 2008 affidavit.  Tr. at 768-770, 789-790. [1]

82. The March 7, 2008 affidavit contained six scattered references to documents and other information that Agent Kang obtained from the SEC, but nowhere disclosed that the SEC was actively investigating Mr. Rajaratnam for insider trading or that the FBI and USAO had worked closely with the SEC in connection with that investigation for the last year. Nor was there any mention of the voluminous documentary evidence, testimony, and interviews that the SEC had made available to the FBI and USAO. *See* Kang Ex. 1 at 15 (n.6), 16 (n.9), 31 (¶30(e)), 35 (¶30(m)), 37-38 (¶34), 44 (¶39).

## The October 15, 2009 Criminal Complaint Against Mr. Rajaratnam

83. The criminal complaint alleges that Mr. Rajaratnam engaged and/or conspired to engage in insider trading in the securities of seven companies: Polycom, Google, Hilton, Clearwire, AMD, Akamai, and PeopleSupport. *See* Kang Ex. 41. The evidence described in the criminal complaint pertaining to Polycom, Google, and Hilton was developed exclusively by conventional investigative means, without use of any wiretap evidence. *See* Kang Ex. 41.

84. Much of the evidence pertaining to the criminal complaint's allegations as to Polycom, Google, and Hilton was gathered by the SEC and made available to the FBI before March 7, 2008. *See* Kang Ex. 21; Michaelson Ex. 128; Tr. at 263, 283-284, 310-312, 536, 605.

---

[1] Indeed, whole sections are identical from one affidavit to the other (save for the names), including the sections on "telephone records,", "federal grand jury," "review of trading records," "witness interviews," "undercover agents," "search warrants," and "arrests". Compare Kang affidavit ¶¶ 37, 38, 39, 40, 42, 43, & 44 with Goffer affidavit at ¶¶33, 34, 35, 36, 38, 39 & 40. Because the Goffer affidavit is still under seal, attached is an exhibit displaying just these cited paragraphs from the Goffer affidavit, which do not reveal anything other than the boilerplate provisions cited herein.

28

### III. ARGUMENT

Mr. Rajaratnam has proven the "key" facts identified in the Court's August 12, 2010 Order. Indeed, the factual chasm between the investigation described in the affidavit and the investigation that actually occurred is not in serious dispute. The government does not dispute that, when the affidavit said the government did not know where records were kept, it actually knew where four million records were that could be reviewed by the FBI. Nor does the government dispute that, when it said that grand jury subpoenas could not be used, they actually had been and could continue to be used. There is also no dispute that, when the affidavit said that Roomy Khan had not been convicted, she in fact had a felony conviction for fraud. Likewise, when the government said interviews could not be undertaken, in actuality (i) a score of interviews and depositions had occurred; (ii) for a year, the FBI had forbidden those select interviews that would interfere with its investigation while letting others proceed, and (iii) the USAO did not read the results of all those interviews "cover to cover."

Instead, the government's position throughout the hearing was that the falsehoods and misrepresentations were not "material" because the government had unilaterally determined that Judge Lynch did not need to know about them. *The FBI and USAO unilaterally decided* that the SEC investigation was "useless," even though it constituted almost the entirety of the FBI's supposedly independent investigation. *They decided*, without any anchor in Title III's text or precedent, that obtaining and reviewing millions of pages of documents, witness interviews, depositions, and trading records is not a conventional law enforcement method and can be ignored just because the SEC had given those materials to them. *They decided* that Roomy Khan's failed earlier effort to point the finger at Mr. Rajaratnam to save herself was irrelevant and too "stale" for Judge Lynch, even though it was acutely relevant to their own assessment of Khan's credibility and determination of the scheme's supposed *modus operandi*. And *they*

*decided* that Khan could lie about everything else, but still be truthful about Mr. Rajaratnam, depriving Judge Lynch of the key facts bearing on the credibility of the affidavit's star witness. The problem for the government is that Title III and the Fourth Amendment long ago decided that Judge Lynch must make each of those determinations based on full and complete disclosure.

## A. The Government Knowingly and Recklessly Made False Statements and Material Omissions in the Wiretap Affidavit

The March 7, 2008 affidavit made no mention of the fact that the SEC had been investigating Mr. Rajaratnam for insider trading for several years. It completely omitted that the SEC had obtained millions of relevant documents from Galleon, or that it had sent hundreds of additional document requests to third parties including banks, brokerages, telephone companies, and issuers of securities. It did not mention that a team of SEC examiners had inspected Galleon documents and interviewed Galleon employees on-site for five months in 2007, or that the SEC had informally interviewed or taken sworn, on-the-record testimony from nearly two dozen witnesses, including two interviews and one formal deposition of Mr. Rajaratnam. The affidavit was equally silent about Mr. Rajaratnam's full and voluntary cooperation just months earlier with an FBI criminal investigation. The affidavit also completely omitted the fact that the FBI and USAO had issued dozens of grand jury subpoenas to banks and telephone companies for records in addition to the millions of records gathered by the SEC. Instead, the affidavit stated that grand jury subpoenas, witness interviews, and search warrants could not be used because witnesses could not be interviewed and would not testify voluntarily and because relevant documents could not be located. Ms. Goldberg, who wrote the affidavit, conceded that these key factual assertions were cut-and-paste boilerplate.

There is no dispute that Agent Kang and Ms. Goldberg knew all of those facts when it submitted Agent Kang's affidavit to Judge Lynch on March 7, 2008. The evidence proves, and

30

Agent Kang and Ms. Goldberg both conceded, that the FBI and USAO participated in, and had the benefit of, the SEC's investigation of Mr. Rajaratnam for a full year preceding the March 7, 2008 wiretap application. The USAO requested access to the SEC's complete investigative file on March 26, 2007 and the SEC granted the request. But neither the FBI nor USAO ever went and reviewed the complete file. On March 29, 2007, the SEC, USAO and FBI held their first meeting to review the evidence that the SEC had developed. Agent Kang was at that meeting. For the next year, the three agencies met regularly and communicated frequently by conference call, email, letter, and fax. Although the FBI and USAO could have inspected any evidence in the SEC's investigative file upon request, they chose to rely on the SEC to identify, analyze, and digest the most important evidence for them. The SEC did so, supplying its law enforcement partners at the FBI and USAO with detailed analytical work product, including stock-specific factual chronologies, charts demonstrating suspected "links" and "networks" among the individuals under investigation, charts listing "issuers of interest" and suspected sources of inside information for each, and comprehensive contact lists identifying dozens of individuals of interest to investigators. The FBI and USAO also met with the SEC before Mr. Rajaratnam's deposition to "talk strategy," and they received the transcript of Mr. Rajaratnam's deposition as soon as it was available, although the USAO could not be bothered to read the deposition "cover to cover" before seeking a wiretap. In short, the evidence proves that the FBI, USAO, and SEC acted as "law enforcement partners" who worked "closely together" throughout the investigation of Mr. Rajaratnam, exactly as the United States Attorney and SEC Director of Enforcement would later boast, and as the government witnesses readily admitted.

Ms. Goldberg, who actually wrote the affidavit, explained that this information was not disclosed because "it never crossed [her] mind" to include it. Mr. Michaelson, who sponsored

31

the government's subsequent applications and affidavits in July-November 2008, provided exactly the same explanation in exactly the same words. And Agent Kang, who signed these affidavits, testified that he "didn't really think about" including this information. That testimony is simply a confession of, at best, recklessness. Indeed, "recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality" of a search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). Title III explicitly lists the facts that must be disclosed, including "a full and complete statement as to whether or not other investigative procedures have been tried," and the statute makes no distinction between investigative procedures used by civil law enforcement agencies versus criminal authorities. The government witnesses all testified that they had read and were familiar with Title III and its requirements, including the "full and complete" requirement. The evidence also shows that Ms. Goldberg and Agent Kang were specifically admonished by OEO that the necessity section was "particularly important" in this case. Accordingly, the witnesses' claim that it never even occurred to them to disclose facts that Title III expressly identifies proves, at a minimum, that they acted recklessly.

But it is hard to stop there. The affidavit, after all, was not silent about these subjects. If it were, that might be consistent with something slipping an individual's mind. But the affidavit asserted the *exact opposite* of the truth – yet nobody noticed. It simply is not credible to claim, while expressly asserting that the location of records has not been identified "at all," that Agent Kang did not even think about the four million records that had been found and were awaiting his review. Nor is it plausible that, when asserting that grand jury subpoenas could not be used, it slipped everyone's mind that dozens of grand jury subpoenas had been used in the preceding months. And how could an agent assert flatly and unqualifiedly that an individual has not "been

32

charged with any crimes" when the agent knows the person has been convicted of felony fraud? Recklessness is an understatement.

Ms. Goldberg's frank admission that key portions of the necessity section were boilerplate is also a confession of recklessness. Title III forbids such reliance on boilerplate. The government must show why the particular case "present[s] problems different from any other." *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983); *see also United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001) (suppressing wiretap evidence because application did not distinguish investigative problems in that case from most or all drug conspiracy investigations). DOJ's internal guidance manuals, with which Ms. Goldberg was familiar, also expressly forbid the use of boilerplate necessity allegations. Yet Ms. Goldberg admitted that key paragraphs of the affidavit – including the paragraphs concerning grand jury subpoenas, witness interviews, and search warrants – were unmodified boilerplate. Those boilerplate paragraphs affirmatively asserted that witnesses could not be interviewed and would not testify voluntarily and that relevant documents could not be located. No effort was made to adapt those paragraphs to reflect the facts – fully known to Ms. Goldberg and Agent Kang – that Mr. Rajaratnam and others had been interviewed, that Mr. Rajaratnam and others had testified, that Galleon was an SEC-registered hedge fund subject to extensive recordkeeping requirements, and that the SEC had actually subpoenaed and obtained millions of documents from Galleon and dozens of third parties.[2] The boilerplate grand jury paragraph also baldly asserted that grand jury

---

[2] Agent Kang testified that the affidavit's reference to as-yet unlocated documents referred to faxes containing inside information that an anonymous source claimed were being sent to Galleon. That testimony, in addition to being inconsistent with Ms. Goldberg's admission that the paragraph was simply boilerplate, cannot be squared with the fact that the SEC had already requested and obtained the faxes sent and received by Galleon – records that Agent Kang admitted he simply had not bothered to review. What is worse, that assertion hid from Judge

33

subpoenas would not yield critical evidence, without mentioning that the government had actually served dozens of grand jury subpoenas by that time and obtained extensive evidence from them. This blind reliance on unmodified boilerplate necessity allegations -- allegations that bore no resemblance at all to the known facts – was, by definition, reckless. *See United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993) (Sotomayor, J.) (officer's affidavit was recklessly misleading where it "failed to take account of the facts as he knew them"). These false boilerplate statements are not cured by the self-serving testimony of Agent Kang and Ms. Goldberg that they did not intend to mislead the court, since they knowingly and recklessly made the false statements and omissions and that resulted in the court being mislead.

## B. The Government's *Post Hoc* Justifications for Omitting Key Facts from the Affidavit Are Irrelevant, Incredible, and Contrary to the Evidence

Although the government witnesses all testified that it never even occurred to them to mention the successful use of conventional techniques in the affidavit, they offered astonishingly coordinated explanations for why they omitted those facts. But if it never even occurred to them to disclose the SEC's investigation, then the excuses that they provided never actually occurred to them either, and are simply *post hoc* rationalizations. As such, they are not part of the "remaining content" of the original affidavit that this Court considers in resolving the motion to suppress. *Franks*, 438 U.S. at 156. If relevant at all, it is only to prove that the government arrogated to itself the materiality decision that was Judge Lynch's alone to make. The government's obligation was unambiguous:  provide a full and complete statement of the other investigative procedures that had been tried. It had no right to omit facts that any reasonable judge would want to know simply because the government had decided they were unimportant.

Lynch that a central impetus for seeking a wiretap was a suspicion grounded in a completely anonymous letter that the FBI had no basis whatsoever for crediting.

In addition to being *post hoc* and irrelevant, the reasons given for the government's omission of these key facts defy the record. For example, the government witnesses repeatedly claimed that the SEC's investigation was "separate" from and "parallel" to the criminal investigation. That blinks reality. "To be parallel, by definition, the separate investigations should be like the side-by-side train tracks that never intersect." *United States v. Scrushy*, 366 F. Supp. 2d 1134, 1139 (N.D. Ala. 2005). These investigations had merged, so much so that the FBI and USAO's supposedly independent investigation was, in fact, profoundly dependent on the SEC, and the only additional efforts undertaken were running names through a database, issuing some grand jury subpoenas (also not disclosed to Judge Lynch), and "receiving" – but not always reviewing – the information compiled by the SEC. The coordination among the three agencies included a key meeting on May 23, 2007 – attended by all three government witnesses – where, in Ms. Goldberg's own words, the three agencies "talked strategy" about Mr. Rajaratnam's scheduled SEC testimony.[3] Nothing parallel about that. The SEC developed and provided the FBI and USAO with detailed chronologies and backup documentation containing a wealth of information relevant to the investigation, including, among other things: (1) issuer-prepared chronologies and lists identifying individuals with access to material nonpublic information; (2) records of stock trades made by Galleon; (3) pertinent IMs, emails, telephone records, and other information related to those trades; and (4) "To Do" lists identifying follow-up investigative steps. The SEC also developed other analytical work product, including lists of issuers and suspected inside sources, and charts showing "links" and "networks" among suspected inside traders. The two agencies also coordinated for a full year on investigative steps

---

[3] That strategy session renders the government's earlier assertion that it was not "involved with" the SEC depositions grossly misleading. *See* Opposition to Motion to Suppress at 65.

such as contacting witnesses, gathering records, conducting a forensic analysis of Roomy Khan's computer, and other items.[4] In short, the evidence overwhelmingly demonstrates that the SEC, FBI, and USAO conducted a *joint* investigation heralded as such by everyone involved – at least until Mr. Rajaratnam filed his Motion to Suppress.

But even if the SEC's investigation had been, in some sense, "separate" from the FBI/USAO investigation, that fact would not justify omitting any mention of the SEC's use of conventional investigative techniques. Title III requires a full and complete statement of the "other investigative procedures" that have been tried. 18 U.S.C. § 2518(1)(c). The statute makes no distinction between the "other investigative procedures" used by the criminal authorities versus those used by regulatory enforcement agencies, nor would such a distinction make sense given the purpose of the necessity requirement. The necessity requirement embodies Congress's determination that "electronic surveillance cannot be justified unless other methods of investigation are not practicable," *United States v. Khan*, 415 U.S. 143, 153 n.12 (1974), and the statute requires a full and complete statement of the other investigative procedures used so that the reviewing judge can decide "after consideration of all the facts and circumstances" whether the government's application presents the "precise and discriminate circumstances" that make a wiretap genuinely necessary. S. Rep. 90-1097 at 73-74 (1968).

It would defeat that clear statutory purpose if the government were able to omit any mention of evidence obtained by a civil enforcement agency through conventional means. It is not at all unusual for criminal investigations to commence as a result of evidence obtained by a regulatory agency such as the IRS, Immigration, or the SEC. To permit the government to gain

---

[4] Mr. Michaelson admitted that the FBI could direct him not to interview witnesses, and documents presented at the *Franks* hearing show that the FBI and USAO checked with the SEC before interviewing witnesses to determine if the SEC had any objection.

the benefit of all the evidence developed by the civil agency, but not disclose it in a wiretap application, would nullify the statutorily required full and complete statement. *See United States v. Aviles*, 170 F.3d 863, 867 (9th Cir. 1999) (holding that reports possessed by one government agent are imputed to the others, and a failure to disclose them to the judge "risk[s] that the wiretap application be held invalid"); *United States v. Aileman*, 986 F. Supp. 1228, 1271 (N.D. Cal. 1997) (suppressing wiretap where no material effort to obtain assistance from customs agent was undertaken and where Canadian investigation not disclosed); *In re Application for Interception of Wire Communications*, 2 F.Supp.2d 177, 178 (D.Mass. 1998) ("The United States may not . . . recklessly remain ignorant * * * and support this application as though the right hand knows not what the left hand does."). But that is precisely what the government did here.

The government witnesses also testified that the affidavit omitted any mention of the SEC investigation because the FBI and USAO could not "direct" the SEC, referring to the *Stringer* and *Scrushy* decisions. But the issue is not whether the FBI and USAO could "direct" the SEC. The FBI and USAO cannot "direct" courts to issue search warrants either, but that technique still must be considered and disclosed in an affidavit. The issue is whether resort to a wiretap was necessary or whether alterative techniques remained available, which routinely include cooperation with other law enforcement agencies like Customs, Immigration, the Secret Service, or state and local law enforcement agencies, none of which the Attorney General can "direct." As Mr. Michaelson candidly acknowledged, while the FBI could not generally direct the SEC, "it could ask" for help and materials, and for a year it had done just that. The critical

point is that, once again, it was for Judge Lynch to decide whether the availability of SEC materials and its extensive cooperation rendered a wiretap premature or otherwise unnecessary.[5]

It likewise usurped Judge Lynch's role for Ms. Goldberg and Agent Kang to omit any mention of the fact that that Mr. Rajaratnam and others had testified about the subjects under investigation and to declare a wiretap necessary just because no one had "confessed" to insider trading.  Tr. at 65-68, 324, 347, 443, 627-29, 807-08.  That an investigation target denies wrongdoing is hardly a justification for a wiretap, nor is it any indication that conventional investigative techniques have failed.

Moreover, the government's claim that these interviews and depositions were "worthless" again puts the government's arguments and testimony at war with each other.  Mr. Michaelson testified that, after obtaining the information provided by Mr. Rajaratnam in his deposition, he increased the number of stocks he was investigating, and the evidence shows that the SEC issued follow-up document requests and subpoenas after Mr. Rajaratnam's interview in March 2007 and his deposition in June 2007.  Mr. Michaelson subsequently was detailed from the SEC to the USAO to work on this case precisely because his knowledge of the SEC investigation was considered so helpful by the criminal authorities.  As Agent Kang put it:  "[T]he [SEC] staff attorneys and Andrew [Michaelson] and others, they knew the case inside out.  They were dedicated to the case.  They knew more about the case than I did, obviously, at the time." *See* Tr.

---

[5] *Stringer* and *Scrushy* have nothing to do with wiretaps, *Franks* hearings, or the necessity disclosures required by Title III. *See United States v. Stringer*, 535 F.3d 929, 936-41 (9th Cir 2008); *United States v. Scrushy*, 366 F. Supp. 2d 1134 (N.D. Ala. 2005). Mr. Rajaratnam, moreover, does not dispute that the SEC's civil investigation was genuine and not a pure Trojan horse for law enforcement, as it was in *Scrushy*. The point instead is that, as a result of the coordinated efforts of the SEC, FBI, and USAO, the FBI and USAO had materials, interviews, documents, and leads at its own fingertips that it flatly denied having to Judge Lynch. That is not a *Scrushy* problem; it is a truth-telling problem.

at 614. This no doubt explains why Ms. Goldberg sent Mr. Michaelson a series of email messages asking for information that she included in the wiretap affidavit itself. Indeed, Ms. Goldberg and Agent Kang admitted that they did not even review the entire investigative file for themselves, leaving it to the SEC to analyze the voluminous documentary and testimonial evidence gathered by conventional means. And when the Court asked what the USAO and FBI had done to investigate the case independently of the SEC, Ms. Goldberg candidly admitted that the criminal authorities had relied almost completely on the SEC, including interviewing Roomy Khan (a witness the SEC had identified), and otherwise had subpoenaed certain telephone and financial records.

The evidence also shows that the SEC had provided the FBI and USAO with leads on a number of witnesses, including Anil Kumar and Danielle Chiesi, that the FBI and USAO (unbeknownst to Judge Lynch) failed to pursue before rushing into a wiretap.[6] In light of the almost complete passivity of the USAO and FBI for the first year of the investigation, and the confessed lack of any serious independent effort by the criminal authorities, the problem was not the value of the SEC's work, but the lack of conventional work by the USAO and FBI.

The idea that the SEC investigation was "worthless" is also belied by the fact that the SEC's conventional investigation lead directly to at least three of the counts now charged in the Superseding Indictment. Count 2 charges that Mr. Rajaratnam conspired with Roomy Khan involving trading in Polycom, Google, Hilton and others – facts derived entirely from evidence developed by conventional means, much of it by the SEC before March 7, 2008. Indeed, it was

---

[6] The contention that they could not approach other potential cooperators while still working with Roomy Khan gets the government nowhere because the wiretap affidavit explained that the government did not expect to obtain any more information from Khan. Thus, even if the argument that the government cannot develop two witnesses at the same time were credited, the affidavit itself confesses that the time had arisen to approach new witnesses.

39

the SEC's on-site examination that produced the January 2006 IM concerning Polycom that led directly to the FBI's decision to approach Khan and obtain her cooperation. Likewise, Count 3 charges that Mr. Rajaratnam conspired with Rajiv Goel, an Intel employee whom Mr. Rajaratnam first identified as a friend and contact in his March 9, 2007 interview with the OCIE examination staff.    It was the SEC's conventional investigation that first identified communications between Mr. Rajaratnam and Goel around the time of certain Intel earnings announcement, and that identified trading activity in Goel's personal Charles Schwab account from Galleon computer log-ins.  And Count 19 charges insider trading involving Goel and Intel in April 2007 based almost entirely on evidence gathered by the SEC before March 7, 2008. Evidence cannot be simultaneously useless and the basis for indictment.[7]

Finally, the government's resort to argument and evidence about the fruits of the wiretaps themselves, *i.e.*, interviews conducted in 2009 with witnesses who "flipped" and cooperated with the government after the government played wiretapped recordings to them, is relevant only to illustrate that the government has been forced to resort to the oldest excuse of all: the end justifies the means. Unfortunately for the government, the Supreme Court has held that "a search is not made legal by what it turns up." *United States v. Di Re*, 332 U.S. 581 (1948). Instead, the search "is good or bad when it starts and does not change character from its successes." *Ibid.* Accordingly, neither Title III nor the Constitution will tolerate the bootstrap

---

[7] Agent Kang attempted to downplay the significance of the SEC taking anyone's testimony, claiming that the subjects of an SEC investigation "don't take the SEC case very seriously." Tr. at 640. This assertion makes no sense in light of Agent Kang's other testimony that the FBI could ask the SEC to hold off interviewing someone because the interview might change that person's behavior. Tr. at 624-25. Furthermore, SEC testimony is taken under penalty of perjury and the witness is warned of the possibility of a referral to criminal authorities. For a registered investment advisor like Galleon, the SEC has the authority to put the company out of business and to bar Mr. Rajaratnam from working for it. Therefore, it was a profoundly significant matter for the SEC to take his testimony under oath.

argument that a wiretap is necessary because, without it, the wiretap evidence would not have been obtained. Such evidence could not possibly have been relevant to Judge Lynch's necessity determination on March 7, 2008, or the government's determination about what to tell Judge Lynch in the affidavit, since it did not even exist yet. *See United States v. Curreri*, 388 F. Supp. 607, 621-22 (D. Md. 1974) (necessity allegations must be viewed in light of circumstances as they existed and were known or reasonably anticipated at the time and cannot be "bootstrapped" by what the wiretaps later uncovered).

## C. The Government's False Statements and Omissions Were Material

In its August 12, 2010 Order, the Court described the facts omitted from the March 7, 2008 affidavit as "key," and indeed they were key to Judge Lynch's assessment of necessity. Any reasonable judge would want to know that the FBI had at its fingertips four million unreviewed documents, more than a score of interview records and sworn depositions, including from the main target, more than 200 responses to third-party requests for information and grand jury subpoenas. Indeed, the fact that Agent Kang's affidavit addressed these subjects *at all* demonstrates that they were material to the necessity inquiry, and an affidavit that failed to address witness interviews and document subpoenas would no doubt be rejected by the issuing judge as facially insufficient under 18 U.S.C. § 2518(1)(c). The problem in this case is that Agent Kang's affidavit addressed these subjects, but addressed them falsely – which, of course, is worse than not addressing them at all.

The government's arguments to the contrary cannot withstand scrutiny. *First*, the government offered conclusory testimony that the omissions and misstatements were immaterial because it would be "obvious" to anyone reading Agent Kang's affidavit that the SEC had been conducting an investigation. But as the Court itself has noted, it is unclear whether Agent Kang's

41

drastic truncation of the SEC's activities, and the FBI's involvement with them, make the omission "better or worse." 07/27/10 Tr. at 94-95. They certainly do not reveal the extensive materials left in the FBI's hands or the government's multi-faceted ability to obtain interviews and records without compromising its investigation. The affidavit's scattered references to the SEC do not even remotely suggest that the SEC had been conducting a formal investigation into Mr. Rajaratnam's activities for several years – much less that the FBI and USAO had participated actively in that investigation for a year and had received the benefit of it. Indeed, there is nothing in Agent Kang's affidavit to suggest that the FBI had obtained anything other than trading records routinely on file with the SEC. And of course there is nothing at all in the affidavit that would alert the reader to the fact that Mr. Rajaratnam and others had actually been interviewed and had testified voluntarily, contrary to the affidavit's affirmatively false claims that interviews were impossible and that witnesses would not testify voluntarily.

*Second*, the argument that, even if the wiretap application had disclosed the SEC investigation and the evidence it provided to the FBI and USAO, a wiretap would still have been necessary to keep the criminal investigation covert defies both fact and law. As a matter of fact, it ignores that the FBI and USAO remained covert for an entire year while their law enforcement partners at the SEC gathered millions of pages of documents and hours upon hours of relevant testimony using precisely the techniques that Agent Kang's affidavit asserted were unavailable. It also ignores that the criminal authorities had issued grand jury subpoenas to numerous third parties and "flipped" one witness – Roomy Khan – while remaining covert, and had identified at least twelve other witnesses as candidates for possible approach.

As a matter of law, the argument fails because it was never presented to Judge Lynch. The affidavit did not disclose that the SEC investigation had been successful despite being overt,

or that grand jury subpoenas had not compromised the confidentiality of the investigation. The government cannot be permitted to present the issuing judge with a misleading statement of facts and misleading explanation of the need for wire surveillance only to later present a different judge with a different statement of facts and a different explanation of the need for a wiretap. To hold otherwise would render the initial *ex parte* application proceeding a hollow ritual providing no meaningful protection to the rights of individuals and no incentive for the government to provide the full and complete (and truthful) statement that the statute explicitly requires.

Indeed, if a simple desire to remain covert were sufficient to justify a wiretap, then wiretaps would be considered necessary in every criminal investigation because criminal investigators always prefer to remain covert as long as possible. However, the necessity requirement demands individualized specification of the necessity of the wiretap, which did not and could not occur here given the overt SEC examination, its express warnings that criminal investigations could ensue, and Mr. Rajaratnam's and Galleon's proven cooperation with both civil and criminal investigators.. *See United States v. Hoffman*, 832 F. 2d 1299, 1306-1307 (1st Cir. 1987) ("The basis for the statutory admonition is the salutary notion that the sovereign should make a reasonable, good faith effort to run the gamut of normal investigative procedure before resorting to means so intrusive as electronic interception of telephone calls."); *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) ("Although the government need not pursue every alternative means of investigation, neither should it be able to ignore avenues of investigation that appear both fruitful and cost-effective.").

*Third*, the government asserted that the conventional investigation had "hit a bit of a wall" by March 2008. That argument cannot be reconciled with the witnesses' repeated assertion that it never even crossed their minds to include the SEC's investigation in the March 7, 2008

43

affidavit at all.  Moreover, the government's belated reliance on this previously undisclosed justification simply proves the materiality of the facts omitted from the affidavit.  If it were true that a wiretap was necessary because the conventional investigation had hit a "wall," yet the "wall" was never disclosed or explained in the affidavit, then it follows that this information was known, material, and not provided to the issuing judge.  The government cannot be permitted to rely on such rationalizations now, when it failed to disclose them to Judge Lynch in the first instance.  "[A]n otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate."  *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971).

Beyond that, the government cannot even explain *which* investigation hit a wall.  Surely not the SEC investigation because the SEC never said so – it was actively continuing its conventional investigation oblivious (we are told) to the government's wiretap application.  And if it had hit the wall, the affidavit would have had to spell out for Judge Lynch everything the SEC had already tried.  Of course, that did not happen.  The assertion that the criminal investigation "hit a wall" fares no better, because that investigation barely got off the ground.  As Agent Kang and Ms. Goldberg both made clear, the government did little more than receive the SEC's materials, run some names through a database, issue grand jury subpoenas and work with the SEC in developing Khan as a cooperator.  No other potential cooperators were investigated; the use of grand jury subpoenas had not been exhausted; existing documents, interviews, and depositions had not even been read "cover to cover"; no attempt to infiltrate Galleon was undertaken despite the openness of the company's operations; and the SEC, FBI, and USAO were continuing to pursue additional investigative leads by conventional means, including leads on suspected sources and co-conspirators such as Anil Kumar and Danielle Chiesi.  *See Ailemen*,

44

986 F. Supp. at 1241-1242 (suppressing wiretap where the "government launched a successful investigation that uncovered several promising investigative leads" but "[r]ather than pursuing these leads with traditional methods, the government sought a wiretap").

Beyond that, the government's belated claim that a wiretap was necessary because the SEC's investigation had "hit a wall" is impossible to reconcile with the testimony of its own witnesses, each of whom confirmed that the FBI and USAO never consulted with the SEC about the need for wire surveillance before March 7, 2008, and each of whom claimed that it never even crossed their minds to disclose the existence and fruits of the SEC's conventional investigation to Judge Lynch. The idea that no one in the FBI or USAO ever even thought about disclosing the SEC's investigation would be difficult to believe under any circumstances; such testimony is completely incredible if the FBI and USAO in fact decided to seek a wiretap because the SEC's investigation had "hit a wall."

*Fourth,* the government's witnesses also testified that the omission of the conventional investigation was immaterial because the government had been unable to identify all of Mr. Rajaratnam's alleged sources using conventional means, and was therefore unable to determine the full scope of the alleged criminal scheme without a wiretap. As an initial matter, the government cannot satisfy the statutory requirement of necessity simply by defining the goals of its investigation so expansively that no investigative technique, including wire surveillance, could ever satisfy them. *See Blackmon,* 273 F.3d at 1211 ("The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances. Doing so would render the requirements of § 2518 nullities.").

More importantly, the government's argument rests on the false premise that it was unable to use conventional investigative techniques after March 7, 2008. The evidence

45

demonstrates that, by March 2008, the government had identified Mr. Rajaratnam's suspected sources of inside information on a number of stocks, including Polycom, Google, Hilton, Intel, Juniper, Cisco, Xilinx, and @Road. *See supra* Fact Findings ¶¶68-70. The evidence also demonstrates that the government was actively investigating additional individuals who allegedly provided Mr. Rajaratnam with inside information on other companies, including Anil Kumar, Danielle Chiesi, and Ali Far. As to Anil Kumar, in particular, the evidence shows that the government had gathered evidence sufficient to identify him as a potential source of inside information for Mr. Rajaratnam with respect to AMD's acquisition of ATI in August 2006. That evidence included: (a) Mr. Rajaratnam's contact list, which identified Kumar; (b) emails reflecting that Kumar was a partner at McKinsey who worked on matters for AMD; (c) telephone records reflecting frequent contacts between Mr. Rajaratnam and Kumar; (d) a Galleon investor list identifying Kumar as a person associated with accounts held in the name of Manju Das; and (e) a chronology prepared by AMD that identified Kumar as a person with inside information regarding AMD's acquisition of ATI.

Questioned about these documents, Mr. Michaelson acknowledged that they were contained in the SEC's investigative file before March 7, 2008, but said that he simply "missed" the connection. Perhaps – but that does not explain why the FBI missed it too. That is, unless they were not independently reviewing and analyzing the materials from the SEC and were, instead, conducting a heavily dependent "independent" investigation. Even then, a wiretap cannot substitute for simple investigative elbow-grease.

*Fifth,* nothing demonstrates the materiality of the facts omitted from Agent Kang's affidavit more clearly than Ms. Goldberg's answer to the Court's final question. Asked to describe what the USAO and FBI had done to investigate this case apart from relying on

46

evidence gathered by the SEC, Ms. Goldberg effectively conceded that the criminal authorities had done almost nothing independently of the SEC – apart from interviewing Roomy Khan (whom the SEC investigation had identified) and subpoenaing certain financial and telephone records. Given the criminal authorities' almost complete reliance on the SEC's conventional investigation to develop evidence prior to March 7, 2008, the government's argument that the SEC's investigation was nevertheless immaterial to its showing of necessity is nothing short of breathtaking. Title III makes no distinction between materials that the FBI has based on their source – civil or criminal. The point here is that, whatever the source, the FBI had massive amounts of unreviewed materials and unexploited leads at its fingertips. Nor would the government's artificial limitation on the necessity analysis make sense. The government would turn it into an inquiry that focuses not on genuine need, but on bureaucratic linedrawing – something of no real concern to the Fourth Amendment principles than animate Title III's necessity requirement.

## D. The Government Intentionally and Recklessly Omitted Facts Concerning Roomy Khan Material to its Showing of Probable Cause

The evidence presented at the *Franks* hearing also proves that the government knowingly and recklessly omitted critical facts regarding Roomy Khan's credibility, and that these facts were material to its showing of probable cause. In particular, the government witnesses all testified that they were aware of Khan's prior fraud conviction in the Northern District of California, and were also aware that her conviction involved her relationship with Mr. Rajaratnam. Indeed, the witnesses all agreed that Khan's prior conviction and cooperation were key reasons why the criminal authorities decided to approach her in late 2007. Nevertheless, the witnesses also testified that they omitted Khan's conviction from Agent Kang's affidavit – which instead falsely stated instead that Khan had "not yet been charged with any crimes" – because

47

they considered it to be "stale." They also testified, bafflingly, that the showing of probable cause would have strengthened if her fraud conviction – and commission of further felonies at or about the time of her probation – had been disclosed. If the government really thought that serial criminality and a pattern of fingering Mr. Rajaratnam to save her own skin enhanced Khan's reliability, they had to make that case to Judge Lynch, rather than preempting that credibility judgment by withholding the critical facts. The fact that Agent Kang and Ms. Goldberg would comfortably testify that they made a deliberate decision to omit an informant's prior fraud conviction, and to state instead that the informant had "not yet been convicted of any crimes," because they unilaterally concluded that the information was "stale" for Judge Lynch is a telling measure of their contempt for the *ex parte* process.

In addition to Khan's prior conviction, the evidence also proves that the government doubted Khan's truthfulness well before March 7, 2008, and that Ms. Goldberg candidly acknowledged those doubts in communications with her colleagues at the USAO. Despite those doubts, Ms. Goldberg and Agent Kang presented Judge Lynch with an affidavit that unqualifiedly described Khan as "reliable," and that made no mention of the numerous lies that the government knew Khan had told and continued to tell. The evidence even shows that the initial draft of the wiretap affidavit did not assert that Khan was reliable – and for good reason. Just three weeks earlier, Ms. Goldberg determined that Khan could not be trusted with respect to allegations against every other target except Mr. Rajaratnam, stating in an email to her colleagues: "[W]e're not convinced yet [Khan] [i]s being completely truthful about other possible targets." Goldberg Ex. 17; Tr. at 751-55. Instead, the word "reliable" only appeared at the suggestion of OEO. Because Khan's truth telling was, at best, erratic, Judge Lynch was entitled to know that so he could determine if the confidential informant was credible. It was not

for the government to decide unilaterally that the allegations against Mr. Rajaratnam were the one and only occasion when Khan managed to let a little truth slip out.

## IV. CONCLUSION

In sum, this case is about who decides the genuine necessity of a wiretap. In the *ex parte* proceedings in which a wiretap authorization is sought, judges must be able to rely on the forthrightness, fullness, and completeness of the government's disclosures. Neither this Court nor any other court can exercise its vital constitutional duty to independently evaluate probable cause or the necessity of a wiretap if the government is given license to gerrymander its affidavits in a way that preempts, obfuscates, or takes entirely out of the judge's hands the hard and novel decisions that an application requires. The content of this affidavit, as well as the cavalier attitude that produced it, are the antithesis of Title III's "full and complete" disclosure requirement. Even more worrisome, the government trumpets this as its flagship wiretap application – the first ever in an insider trading case. This latticework of falsehoods, misrepresentations, and material omissions thus apparently is the government's standard bearer for wiretap affidavits and, as Ms. Goldberg explained, will be the cut-and-paste model for future wiretap applications.

The government's central response is that it could have submitted an entirely different affidavit that would have passed muster, so no harm done. But a *Franks* hearing is not a second bite at the apple. The only questions are whether the statements in the affidavit were false or misleading, whether the misrepresentations were material in that any reasonable judge would want to know those facts in assessing necessity, and whether the remaining content of the affidavit that was submitted to the Court does not otherwise establish necessity. Falsehoods and critical omissions pervade this affidavit. The information withheld would be important to any reasonable judge assessing necessity. And when those falsehoods are excised and corrected, the

remaining content of the affidavit is, as this Court noted, a "black box" for establishing necessity. 07/27/10 Hearing Tr. at 96. The facts foreclosing conventional methods simply are not there. Quite the opposite, the true facts show that the government had not done its homework and was using the wiretap as a shortcut, knowing that conventional methods had worked and were working with great success, just as they had in every other insider trading case for the last **three** decades. If boilerplate necessity averments that bear no resemblance at all to the true history of the government's use of conventional investigative methods are permitted here, then the government will know that "the ploy was worthwhile," *Franks*, 438 U.S. at 168. After all, what reason will the government have to be forthcoming, full, and complete in the wiretap application if post hoc rationalizations, the minting of never-before-uttered arguments and excuses, and some old-fashioned "ends justify the means" contentions can always save the case later? Genuinely independent judicial review cannot survive within a legal regime that sanctions such misleading, misinformed, and factually manipulated affidavits. One or the other must give way – the question in this case is whether the Kang Affidavit or meaningful judicial review will prevail.

Dated:  New York, New York
        October 18, 2010

        Respectfully submitted,

        By: _____

        John M. Dowd (admitted *pro hac vice*)
        Terence J. Lynam (admitted *pro hac vice* )
        Patricia A. Millett
        James E. Sherry (admitted *pro hac vice*)
        Akin Gump Strauss Hauer & Feld LLP
        1333 New Hampshire Ave, NW
        Washington, DC 20036
        (202) 887-4000

        Robert H. Hotz, Jr. (RH-4456)
        Samidh Guha (SG-5759)
        Akin Gump Strauss Hauer & Feld LLP

50

One Bryant Park
New York, NY 10036
(212)872-1000

*Attorneys for Raj Rajaratnam*