UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-                                                      S1 09 Cr. 1184 (RJH)

DANIELLE CHIESI,

Defendant.

# SENTENCING MEMORANDUM ON
# BEHALF OF DANIELLE CHIESI

Dated: New York, New York          KELLEY DRYE & WARREN LLP
       June 13, 2011                Alan R. Kaufman
                                    James M. Keneally
                                    101 Park Avenue
                                    New York, NY 10178
                                    (212) 808-5195

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bateman Eichler, Hill Richards, Inc. v. Berner,*
    472 U.S. 299 (1985) ................................................................................................. 20

*Dirks v. SEC,*
    463 U.S. 646 (1983) ................................................................................................. 19

*United States v. Booker,*
    543 U.S. 220 (2005) ................................................................................................... 2

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ...................................................................................... 3

*United States v. Ovid,*
    No. 09-CR-216(JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) ........................... 3

*United States v. Preacely,*
    628 F.3d 72 (2d. Cir. 2010) (J. Lynch concurring) ................................................... 2

**STATUTES**

18 U.S.C. § 3553(a) (2010) .............................................................................................. 2, 3

This Memorandum is submitted in anticipation of the sentencing of Danielle Chiesi, scheduled for June 30.

On January 19, 2011, Ms. Chiesi pleaded guilty to the three conspiracy counts in which she was named, pursuant to a Plea Agreement.  She pleaded guilty despite having been granted a severance from Raj Rajaratnam, with her trial to take place subsequent to his, and despite the pendency of a motion to suppress her post-arrest statements which motion was mooted by her plea.  The timing of her guilty plea was largely a function of awaiting the outcome of her motion to suppress the wiretaps on her telephones.  Counsel had advised Ms. Chiesi that he believed it to be a meritorious motion — most specifically, the necessity prong of the motion — one which implicated fundamental privacy concerns under the Fourth Amendment.  Ms. Chiesi understandably pursued that motion and awaited the outcome.  Shortly after the motion was denied in late November, counsel and the government began plea discussions, culminating in the Plea Agreement and the guilty plea.[1]

The three conspiracy counts to which Ms. Chiesi pleaded guilty were labeled as the Moffat Conspiracy (Count Five), the Rajaratnam Conspiracy (Count Six) and the Kurland Conspiracy (Count Seven).  Without needlessly quibbling, this could just as easily be viewed as one overall conspiracy, wherein Ms. Chiesi would obtain or be willing to obtain material non-public information from a source, inform her boss of that information and how she got it so that he could decide whether New Castle would trade on that information and in what amount, and she would share and exchange some of that information with Rajaratnam (and other hedge fund managers).[2]  She acknowledged this in her guilty plea allocution:

---

[1]     The guilty plea obviates any further challenge to that suppression issue.

[2]     See government's summary of evidence at guilty plea, Tr. 14-15.

1

> "From on or about [August] 14, 2008 through on or about January 31, 2009, I on occasion obtained what I thought to be material non-public information concerning IBM, AMD and Sun Microsystems. I understood that the person providing me with this information was doing so in violation of his or her fiduciary duty to his or her employer.
>
> "I shared this information with my boss at New Castle who caused New Castle to execute trades in those securities. I also shared some of the information with other people in the hedge fund industry. With respect to all three companies, I agreed with others to obtain what I thought to be the material non-public information, to share it, and to trade on it.
>
> "In conjunction with the foregoing, I engaged in telephone conversations with these other individuals from my apartment in Manhattan."

The Plea Agreement contains a presumptive Guidelines range of 37-46 months. We do not dispute the Guidelines calculation which produces that range. The Plea Agreement also provides that the defense can argue for a below-the-range sentence based on the factors enumerated in 18 U.S.C. § 3553(a) (2010), and we do so herein.[3]

Those factors have taken on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005):

> "[T]he Sentencing Reform Act as interpreted and rendered constitutional by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), requires sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendant.' 18 U.S.C. § 3553(a)(1)."

*United States v. Preacely*, 628 F.3d 72, 84 (2d. Cir. 2010) (J. Lynch concurring).

This echoed earlier language from the Circuit, emphasizing individualized sentencing and adherence to the parsimony clause of §3553(a):

---

[3]    The Plea Agreement also contains a provision that the defendant will "forfeit to the United States . . . the proceeds she obtained as a result of the offenses charged in Counts Five, Six and Seven of the Indictment." The parties are continuing to discuss forfeiture, and if an agreement is reached prior to June 30 we will, of course, advise the Court.

> "It is now, however, emphatically clear that the Guidelines are guidelines – that is, they are truly advisory.  A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.  District judges are, as a result, generally free to impose sentences outside the recommended range.  When they do so, however, they 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.' [*Gall*, 128 S.Ct.] at 597.  In this way, the district court reaches an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes of sentencing. 18 U.S.C. § 3553 (a)."

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

As Judge Gleeson recently wrote in determining an appropriate sentence under the fraud guideline, in language just as apt here:

> "[[T]he defendant's sentencing] shows how the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.  This reality does not render the Guidelines irrelevant in fraud cases; they are in fact quite useful in all sentencings.  But sentencing judges know that a full consideration of 'the nature and circumstances of the offense and the history and characteristics of the defendant,' 18 U.S.C. § 3553(a)(1), implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in the Commission's Guidelines Manual.  A consideration of those and the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range.  Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider."

*United States v. Ovid*, No. 09-CR-216(JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010).

The §3553(a) factors are well-known to the Court:

> "(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this

subsection.  The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

>> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

> > * * * *

(5) any pertinent policy statement –

> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense."

We respectfully submit that upon consideration of all pertinent factors, a below-the-range sentence is just and appropriate.[4]

We have reviewed the final Presentence Report ("PSR") submitted by the Probation Department, and other than the Recommendation section, have no objection to it. Its Part A accurately reflects the Plea Agreement, Ms. Chiesi's adjustment to pretrial supervision, and comprehensively covers the overall conduct by drawing primarily from the Complaint filed in October 2009. Certainly, as a result of the recently-completed Rajaratnam trial, Your Honor has greater insights into the respective roles played by many of the participants, including Danielle Chiesi. Your Honor is aware that while Ms. Chiesi on occasion obtained material non-public information from corporate insiders and occasionally shared that information, unlike others in this case she never paid for information, she was never paid for information, and she never traded in her own account. The information she obtained was conveyed to her boss, Mark Kurland, who then decided whether and in what amount New Castle would trade on that information.

The PSR also accurately reflects Ms. Chiesi's background and history. Rather than repeat it here in a public document, we respectfully rely on the PSR. We also rely on the many letters which

---

[4] As Your Honor knows, Dani has no prior criminal history. It is extremely unlikely that she will ever work in the financial industry again. She poses no threat to the public. Instead, the most likely threat is to herself given her fragile emotional and mental state, and how her well-being would be affected by a lengthy term of imprisonment. Given the notoriety this case and others have received, a lengthy term of imprisonment is not needed to effectuate general deterrence.

have been submitted to Your Honor, primarily the report from Danielle's treating psychiatrist (Exhibit 1 in the accompanying Addendum) and the letters from family members, especially siblings Pamela (Exhibit 13) and Alexander (Exhibit 10), and mother Gloria (Exhibit 12), and friends Kim (Exhibit 2) and Billy (Exhibit 5), which furnish the Court with personal and intimate recitals of Dani's history.[5]

The letters that have been submitted by family and friends afford Your Honor insights into the person and character of Danielle Chiesi which are very different and could not have been apparent from the recorded conversations offered in evidence during the Rajaratnam trial. We know that Your Honor will consider the letters very carefully and factor them into your consideration in determining the appropriate sentence for Dani. The letters depict her as a loving and devoted daughter, sister, aunt, and cousin, and as a person who will go the extra mile to help someone who is in need. Some of these letters also offer insights into Dani's emotional struggles, witnessed by family and friends who were concerned but unschooled in mental-health issues and thereby ultimately not able to effectively intervene and cause meaningful change. We provide excerpts from just some of the letters herein.

Kim has been a friend for over 20 years, and has worked on Wall Street. She knows how the industry is male-dominated, and how Dani fought to be part of that world while advocating for other women to be treated fairly. Kim writes:

> "Danielle has been an inspiration to many women over the years. Fighting battles for assistants who were abused by their bosses or traders. If you were to ask her specifics she wouldn't answer but when I bring up certain incidents she says 'oh yes, I remember' and can't figure out why or how she blocks things out. We could be out at a business event and I would say 'where did Dani go?'

---

[5]    Because the report contains information which is extremely personal, we submit that it should not be part of the public record. Many of the letters from friends and family likewise contain information which is very personal and therefore should remain private, and not part of the public record. We ask that the Addendum be sealed and not be made part of the public record.

> She would be in the bathroom with the bathroom attendant giving the woman her card and within weeks the woman or possibly her daughter would be working somewhere on Wall Street. She has been a huge supporter and inspiration to me as well. She pushed me to not 'ride on anyone else's coat tails' and to mimic her incredible work ethic and eventually become the managing director of my department and not just another VP. I never went to college. My father was murdered when he was 32 years old and I was 12. One of 4 children, my mom was always a single mom, never remarried or brought a boyfriend home. I always had an inferiority complex amongst colleagues as far as education and Danielle made me realize I was still a worthy competitor although I wasn't formally educated." (Exhibit 2.)

Dani's concern for other women was not limited to those in her industry. Indeed, according to her former housekeeper, Jacqueline, Dani "was the one who encouraged me to finish my college and to be somebody in this life. I was her housekeeper for some time while I finish my college and then her assistant. Thanks to her I am a bookkeeper right now." (Exhibit 22.)

Katelyn, a daughter of Dani's boyfriend, in a remarkable letter writes of dealing with her own mother's abandonment of her, and Danielle's role in helping her cope:

> "In the beginning, I did not want to know Danielle, I did not want her to be part of my life, I was a stubborn teenager wrapped up in myself. Danielle respected the boundaries I set, and though I tried to shut her out, her personality and love was ultimately undeniable. My parents went through a very emotional and dragged out divorce after my mother betrayed my father's trust and cheated on him. My mother became caught up in her own selfishness and put parenting and her children on the back burner. To say the very least, our lives were complicated and we came with a lot of baggage. Not many women could step into a situation such as ours and aid us in piecing our lives back together, but that is exactly what Danielle did. She taught us to move past our anger and to move forward, to learn from our experience, and to love again. Danielle was the light at the end of a very dark tunnel.

> "Now, I could sit here and go into more depth about the relationship she has with my father, but I think what is more important to know, is the relationship she has with me and my three younger brothers. A few years back, my brother Connor,

after getting in a physical altercation with my mother's boyfriend Tom [   ], gave my mother an ultimatum, that she choose him over Tom or he could no longer reside with her.  She ultimately choose Tom instead of her son.  Connor, only a sophomore in high school, packed his things and moved into my father's apartment on 57th Street.  Danielle was standing on the street corner waiting for Connor's arrival.  She took his luggage and his hand and reassured him in his decision.  She made a home and a life for my brother.

\* \* \* \*

"I spent a lot of time learning from Danielle.  She taught me how to be a stronger person, a better person, and a more confident person.  She aided me in finding the right school and major for me.  She was honest with me.  She helped me get out of a world that wasn't doing me any good.  She pointed me in the right direction, without ever pushing me.  I'm a very different and better person today than the person I was then, and I thank Danielle for that." (Exhibit 4.)

Danielle has been a positive influence on her nieces.  Fourteen year-old Samantha has written about how Dani taught her to dance so she would not feel embarrassed at school and about helping her understand that her parents divorce was not her fault.  Dani was Samantha's "role model" and helped her "through the toughest times." (Exhibit 28.)

Billy, Katelyn's father, writes:

"In my judgment, Danielle is a fundamentally good person.  She has been exceedingly generous with her time and resources to veterans of our military.  Danielle's uncle, Ron Chiesi, was a B-52 pilot in the Vietnam War and every year the two of them would attend the annual meeting for the Red River Valley Fighter Pilots Association (RRVA), a retired military pilot organization.  In 1970 the RRVA initiated a Scholarship Program with the objective of 'taking care of our own.'  Since its inception through 2010 the program has awarded over 1,000 grants for several million dollars to the children and spouses of Navy, Air Force, Marine Corps, and Army aircrew members.  Danielle has been a generous donor to their cause.  She is caring and giving to the elderly and in her neighborhood Danielle can often be seen helping them cross busy city streets and even carrying groceries to their homes.  She had gone so far as to give people the coat off her back, not figuratively but for real.  Not surprisingly, Danielle has made donations to shelters for battered women.  She is as devoted to her family as

they are to her, something I am sure you have seen in your
courtroom.  The false bravado and confidence you hear on the
tapes are a one dimensional view of Danielle.  Other dimensions
would show that she is the product of years of abuse.  Abuse is not
something you wear on your sleeve; it's kept hidden out of shame,
self-blame and fear." (Exhibit 5.)

A Vietnam fighter pilot personally attests to Dani's commitment to the Red River Valley

Fighter Pilots, members of the military, and country:

"Dani continued to attend the "River Rat" reunions for the next
five years and over time it became crystal clear that she was there
for one reason and one reason alone . . . Danielle is a patriot and
loves her country.  Often, Dani would introduce herself to Veterans
saying, 'Thank you for what you've done and giving freedom to
me.'  I don't think I have ever heard someone put it quite that way
but her devotion and love for the military and by default The
United States of America was so sincere it was moving.

* * * *

"Over the years, Dani donated generously so our organization's
Scholarship Fund for the spouses and children of those who lost
their loved ones.  So highly thought of she was made an Honorary
member of the Red River Valley Fighter Pilots Association.  Dani
has earned my respect and the respect of my brothers in arms. . . .

* * * *

"As a Fighter Pilot, there is an expression when you have got
someone's back, you are 'checking their six.'  In my own way, I am
writing this letter in support of Danielle and 'checking her six.'
While you have to decide what sentence to impose on her because
of what she has done, I hope somehow you can balance the scales
of justice with what she has done for retired veterans of our
military, me foremost among them." (Exhibit 17.)

A cousin by marriage, Lena, writes about Dani's help and compassion when her husband

Paul was dying of cancer at age 44:

"The diagnosis of cancer has the startlingly jarring ability to affect
the entire family.  We were receiving research and treatment
advice from anyone and everyone but Danielle was the first true
supporter.  She located a prominent physician who specialized in
colon cancer treatment in the hustle and bustle of New York City

and made appointments for a second opinion. She even came with us to each appointment for moral support. The love she showed to us at our time of need will always be appreciated by our entire family. Her careful research into new treatment from New York City as well as abroad was a prime component in our later decisions for treatment methods. Danielle would even go a step farther, giving a gift of $5,000 to each of our two daughters to 'help with college', she later told Paul.

"When Paul passed the fateful spring of 2001, many members of our families assisted us with the cost of funeral expenses. I am grateful for all of the help which I received, but particularly to Danielle, who went above and beyond what any family member would do." (Exh. 7.)

Brother Alexander writes:

"When tragedy struck us with the loss of my father by heart attack in 2002, Danielle virtually moved in with my mother and had my mother stay with her as much as possible to help her deal with her grief. My dad's passing had an immense impact on all of us but I'm certain his passing affected Danielle to her core. To this day, she remains my mother's primary 'caretaker.'" (Exhibit 10.)

Among the many expressions of love one might expect from a mother, Gloria writes of

her daughter's selflessness:

"When we moved from Binghamton, NY to Sherman, CT in 1997 and my father in law died in a car crash in Florida, we arranged for my mother in law, who survived the crash to come and live with us. She needed a lot of care, day and night. Danielle took time off work, slept in her grandmother's room, gladly took the difficult night shift (till we could get an aide) and HER TENDER LOVING CARE made all the difference in the world.

"When my mother in law had a stroke, Danielle made hundreds of calls to get her into Burke's Rehabilitation, in Westchester, where she visited her grandmother daily and helped her learn how to swallow again, since a right CVA paralyzed her esophagus.

"I assure you, Your Honor, when I call Danielle 'my angel,' she is really that and more." (Exhibit 11.)

Sister-in-law Maja writes:

> "I met Danielle when I started dating, my future husband, she was
> welcoming, loving and seemed altogether.  Danielle's true
> compassionate self became apparent when I was attacked at knife-
> point in lower Manhattan in 1994.  She provided essential support
> to me in the hospital and through my rehabilitation.  She remained
> very close to me every step of the way thru my recovery.  Danielle
> sat at my bedside at Bellvue Hospital while I was treated and
> remained with me through my rehabilitation." (Exhibit 12.)

Sister Pamela has written what had to be a painful letter, expressing in great detail the

emotional travails she has observed throughout Dani's life.  The letter has to be read in its

entirety to be appreciated.  We excerpt here just a portion highlighting Dani's generosity and

compassion:

> "Danielle is even more beautiful on the inside than she is on the
> outside. She is generous and caring maybe to an unhealthy extent.
> She freely gives her wealth and influence to those who ask – and
> many people have taken advantage of this generosity. On many
> occasions, Danielle has moved out of her apartment for family and
> friends who visit NYC just because they ask. I recall Danielle
> buying a dress costing a few thousand dollars for one of our
> cousins because she was going through a painful divorce and
> Danielle wanted to cheer her up and 'she liked it and couldn't
> afford it herself'. (Danielle had never bought anything costing that
> much for herself.) Danielle took the time to refer many friends and
> family to NY specialists when they were plagued with health
> crises. To my surprise, because Danielle often does not leave her
> apartment, she got on a train and traveled 250 miles from NY to
> Delaware to help a childhood friend whom she had not seen in
> years move from one house in Delaware to another house in the
> same town – because this girl lamented to Danielle that her move
> would be a burden.
>
> "Danielle opened her home to our brother – for several months at a
> time, on several occasions. Danielle took our younger NY cousins
> to their first day of school from Queens to Marymount in
> Manhattan because our Uncle and Aunt had to work. Danielle,
> more than any of the five grandchildren (including me), took the
> time to visit with and care for our grandmother after her faculties
> were severely compromised by a stroke." (Exhibit 13.)

Cousin Carmela writes:

> "I am 71 years old and disabled for the last two years. Even
> though Danielle had her own problems, she never stopped
> supporting me, giving me encouragement through my disability.
> Danielle gave money at a fundraiser for the Malawi children in
> Africa and won a trip to Paris. Instead of going herself, she sent
> me and her mother, my aunt, to Paris for a week. At that time, we
> went to the Shrine of Our Lady of Lourdes so that we could pray
> together for my condition to get better. She had a convention in
> Nantucket and took me and her mother along and, while she was
> working, her mother and I had the most wonderful time. I was
> very sick and needed a little break and she arranged for me and her
> mother to stay at her friend's house in Naples, Florida. It was the
> best time and relaxation ever. That's the kind of person she is."
> (Exhibit 18.)

Cousin Lucette writes:

> "Examples of her generosity have been:

> "1) Supporting a family member through the difficulty of a
> divorce. Showering this family member with words of
> encouragement. All in an attempt to lift the spirit of a heartbroken
> woman who was to become a single mom to 3 children.

> "2) Danielle made frequent trips to visit family in Philadelphia,
> often at a moments notice. Emotionally supporting family
> members who were struggling with either heartache, terminal
> illness or financial strains. Danielle often volunteered support
> without being asked beforehand. This is her generous & loving
> nature to respond in this way.

> "3) Danielle opened her home to me and countless friends/family
> during frequent visits to the beautiful city of Manhattan. She
> offered her home as a respite to so many friends/family. She did
> this if the call to visit was short notice, a holiday trip to New York,
> or a place to spend the night while canvassing job opportunities in
> the city." (Exhibit 19.)

A Connecticut neighbor of Gloria — Patrick — writes:

> "In 2005 I was diagnosed with Leukemia. In the flash of my
> mind's eye, I was in troubled waters physically and financially.
> There were those who cared, but there were a few unforgettable
> angels along that path. Danielle and Gloria Chiesi were among the
> first to actually come to my side with prayers and a helping hand.

Without asking I was told that I need not worry about the total burden that was thrust upon me. I was not given a chance to say no, I was simply told that help was on its way. Danielle made a promise to me that she would help as much as possible; and that was a promise kept. As is life, no one can know the depths of gratitude for a kind deed done, more than the receiver. I hope this abbreviated story's truth can give you some insight into the dear and caring soul of Danielle Chiesi." (Exhibit 20.)

A letter written by Pamela's ex-husband Jack is remarkable for its devotion and sincerity:

"I have known Danielle for 29 years – 22 of which I was married to her sister, Pamela. Pamela and I are the parents of Danielle's two nieces – Samantha (age 14) and Sabrina (almost 13). Despite my divorce to Pamela, I have maintained a close relationship with both sisters and the entire Chiesi family. Moreover, in the family's words, I was their father's best friend until his death several years ago.

\* \* \* \*

"At the heart of that which I wish to share is Danielle is one of the most loving and caring persons I have ever met. I have consistently witnessed acts of generosity by her for those in need and less fortunate. It could be as simple as lending a sincere ear, rolling up her sleeves to help someone landscape a garden, or travel across the country to visit an ill neighbor or friend. She genuinely cares about people and their well being and understands change (good or bad) for many people is difficult. Remarkably, she always demonstrates an eagerness to help make things better and moreover, she takes the time to understand and provide support and encouragement. I will forever admire Danielle for her optimism, energy and perseverance, qualities so important to successfully helping someone endeavor to a better place, gain self confident, and ultimately, become a better contributing member of society." (Exhibit 26.)

These letters also reflect, as does the PSR, that in the early morning hours of October 16, 2009, Danielle Chiesi's life changed forever as she knew it. She was arrested on charges of inside-trading based primarily on wiretaps on her telephones, which recorded hundreds of conversations, some of which produced evidence of her culpability and many of which revealed elements of her personal and private life.

Three things in her life mattered deeply to Danielle — her family, her profession, and Mark Kurland. After October 16, only her family remained. Her job at New Castle and her relationship with Mark Kurland were gone. In the 20 months since then, Danielle has struggled to adjust to her new reality, severed from most everything she knew and loved. As Your Honor can see from the PSR and the letters written on Danielle's behalf by family, friends, and her psychiatrist, she has had varying degrees of success and setbacks in coping.

For much of the time since her arrest, Dani has been on strict Pretrial supervision.[6] That was due to indications of substance abuse, and concerns expressed by the Pretrial Services Officer over Dani's psychological and emotional stability. Indeed, there was one occasion when her family had her admitted — involuntarily — to the New York Presbyterian Hospital psychiatric facility in White Plains due to what they feared was self-destructive behavior.

In the aftermath of her arrest, Dani had a very difficult time coping with the anxiety of what was going to happen to her. That is presumably not all that unusual with someone who has never been in trouble before but now faces serious charges and whose life has just been upended. In December 2009 she started treatment and counseling with a psychiatrist, Dr. Stephan Quentzel, for help in dealing with the anxiety she was experiencing. In the course of that treatment over the next year, it gradually became clear to Dr. Quentzel that Dani had deeper and more serious issues than anxiety. He diagnosed Dani with Borderline Personality Disorder from which she had been suffering for a very long time. At our request, Dr. Quentzel has written a report, which is Exhibit 1 in the accompanying Addendum.

The purpose of Dr. Quentzel's report is to place Dani's conduct into context. We wish to be clear and explicit here. This is not meant to excuse Dani's conduct, it is not meant to

---

[6]      That was relaxed October 29, 2010.

minimize her conduct.  She knew what she was doing, and when she obtained material non-public information for the benefit of New Castle Partners, she knew it was wrong.  She clearly was capable of conforming her conduct to the requirements of the law, and her failure to do so was knowing and thus resulted in her guilty plea.[7]

Dr. Quentzel's report serves to illuminate the psychological forces which were at work, and which serve to explain the motivations which existed here.  We submit that those forces, those motivations, are very relevant to sentencing, because — while they do not excuse the conduct — they do serve to show that Dani was not acting out of greed or venality, and thus serve to mitigate, we submit, the punishment to be imposed.

It did not take a psychiatric evaluation to know that Dani did not engage in this conduct out of greed.  There has never been the claim that she traded personally in any of those stocks.  Moreover, whatever profits New Castle Partners enjoyed as a result of any of these trades inured to the benefit of the owners of New Castle.  Dani's monetary benefit from these trades would be negligible at best.

As Dr. Quentzel endeavors to explain, supported by letters from the people who know her best, Dani was motivated by an unhealthy and abnormal desire to please, or conversely, by an extreme need to avoid rejection and abandonment.  The primary focus of this was Mark Kurland, but it also affected her interactions with other people in the hedge fund world and with executives at public companies.

---

[7]     The PSR (p. 52) states "We do not agree, however, that her mental condition can, or should, be used as a way to excuse her conduct in this case."  We agree with that — and never made that argument to the Probation Department.  We do agree with the preceding line in the PSR — "We believe that the defendant's personality disorder is certainly, at least in part, a reason for her behavior of this offense."  There is a vast difference between seeking to excuse conduct based on psychological factors, which we are not doing, and suggesting that such factors should be considered in mitigation of punishment, which we are doing.

Mark Kurland was Dani's boss. He was also her lover, for almost 20 years. Dani was, and will say today that she still is in love with him. She resists the idea that Kurland used her for his own purposes, and the truth of that long relationship is probably far more complicated than any of us can know.[8] But the objective facts are not in dispute — Kurland knew that Dani had contacts and connections with people who were in high positions at public companies, he encouraged her to cultivate those contacts and connections, he urged her to get inside information from those people, at times flattering her information-getting abilities, and at the same time belittling her understanding of financial numbers, he controlled her compensation and all other circumstances of her employment, he decided whether or not New Castle would put on trades based on information obtained from Dani,[9] and he, along with his two partners, stood to

---

[8]   To be clear, we are not arguing that Ms. Chiesi's conduct is in any way excused by her relationship with Mark Kurland. Ms. Chiesi reiterates what she said in her guilty plea allocution:

> "Your Honor, I want to add that this guilty plea causes me great pain. I am deeply ashamed by what I did, that by crossing the line on these occasions I ruined a 20 year career in my field that I truly love and I have been extremely devoted to. I brought disrepute to what is an honorable profession.

> "Nothing that I did was for my personal account. I did not trade in these stocks personally, ever. Yet, I knew what I was doing was wrong, and my conduct has hurt many people, including my family, and it has been with their support that I've made it through the past year. I apologize to them and I apologize to the Court for my conduct, and I take full responsibility."

We do submit though that the relationship between Mr. Kurland and Ms. Chiesi is relevant to the awesome responsibility the Court has in this, and every case, in deciding on the appropriate sentence for Ms. Chiesi — it is relevant to understand what motivated her, what psychological and emotional forces were impacting on her that resulted in the conduct culminating in her plea of guilty.

[9]   The dozens of recorded conversations between Ms. Chiesi and Mr. Kurland are replete with examples of Kurland encouraging her to get information, of Kurland belittling her ability to analyze financial data, of Kurland being the New Castle decision-maker regarding investment decisions. Examples of such conversations occurred on August 22, 2008 and September 5, 2008. The relevant portions of the transcripts of those conversations are attached to the Addendum as Exhibits A and B.

gain financially from any profitable transactions made by New Castle as a result of information provided by Dani.

Those who are closest to Dani knew of the toxic "relationships" she had with men, including her abusive ex-husband and especially with Mark Kurland. They understood that her emotional and financial well-being were inextricably linked with Kurland. The depth of this understanding is most telling with Billy. Notwithstanding Dani's unfaithfulness, he understands that Kurland engaged in a "vicious cycle of abuse" and "psychological exploitation" to turn Dani into his "virtual servant". (Exhibit 5 at 2.) He recognizes that "there was little Mark wasn't willing to do to maintain his control over Danielle," including relocating her to San Francisco to appease his wife Peggy who had learned of their affair, and exploiting his full discretion over Dani's income. (Exhibit 5 at 2-3.) Billy's devotion to Dani has been and still is one of the few stabilizing forces in her life. Dani's sister, Pamela, also is aware of Kurland's power over Dani. Kurland "knew exactly how to string [Dani] along . . . he would pay her just enough compliments to keep her begging for more" and "he would criticize her just enough to keep her insecure." (Exhibit 13 at 5.) There is no doubt that Kurland "understood and leveraged the control he had over [Dani] for his gain financially and physically." (Exhibit 13 at 5.)

We think it is self-evident — and can only hope that the Court agrees — that the punishment due for the conduct at issue here should be mitigated once it is recognized as the manifestation of the psychological and emotional forces impacting on Danielle Chiesi, rather than the result of greed and venality. Moreover, even if one were to set aside these mitigating factors, there is still the consideration of section 3553(a)(6) which states in relevant part: "The court, in determining the particular sentence to impose, shall consider - . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct . . ." Mark Kurland is unquestionably a defendant with a similar record who has been found guilty of similar conduct — indeed, as Danielle's boss, he instructed and encouraged her to do what she did and he, more than she, stood to profit from such conduct. Danielle's sentence should be less than Kurland's below-the-range sentence of 27 months.

The sentences received by other defendants in this case should certainly be relevant to the appropriate punishment to be imposed on Ms. Chiesi. In addition to Kurland, those who have been sentenced in this case are Ali Hariri and Robert Moffat. Hariri's sentence was 18 months imprisonment. Moffat's sentence was 6 months imprisonment. As with Ms. Chiesi, all pleaded guilty without cooperating.

Of these three, Ali Hariri had no connection to Danielle Chiesi. Hariri was an executive at a company called Atheros, and disclosed material non-public information about Atheros to Ali Far, a hedge fund manager, knowing that Far would trade on that information. Far was a friend and a mentor to Hariri, who may very well have been cultivating Hariri for information he could provide.[10] Hariri disclosed Atheros revenue numbers and guidance to Far before they were announced, and Far traded Atheros shares in his hedge fund for the fund's benefit.[11] In return, Hariri received stock tips from Far. Hariri's Guideline range was 24-30 months, and he was sentenced by Your Honor to 18 months imprisonment. During that sentencing proceeding, Your Honor observed that sentences in insider trading cases have a greater incidence of non-Guidelines sentences than for most other crimes (Tr. 13-14), and acknowledged that "disparity in sentencing in this area points the Court to a very particularized assessment of the appropriate

---

[10]   Taken from Hariri's Sentencing Memorandum, dated June 22, 2010, pp. 11-12.

[11]   Far pleaded guilty before Judge Patterson on October 19, 2009 pursuant to a Cooperation Agreement. He has not been sentenced. Others in this case who have pleaded guilty pursuant to Cooperation Agreements and have not been sentenced are Rajiv Goel, Anil Kumar, Steven Fortuna, Adam Smith, Richard C.B. Lee, and Roomy Khan.

sentence in each defendant's case." (Tr. 24).  That particularized assessment in Danielle Chiesi's case, we submit, should likewise lead to a below-the-range sentence.

Robert Moffat was a high-level executive at IBM.  He and Ms. Chiesi had an intimate relationship.  He acknowledged disclosing to her material non-public information with respect to IBM, AMD, and Lenovo in 2008.  Ms. Chiesi did not cause New Castle to trade in Lenovo, and New Castle's trades in IBM and AMD did not result in profits.[12]  Moffat was sentenced to 6 months imprisonment by Judge Batts.

In addition to Moffat, the government alleged that Ms. Chiesi received material non-public information from three other sources — Raj Rajaratnam, Hector Ruiz and Kieran Taylor.  The Rajaratnam story is well-known to Your Honor.  Ruiz was CEO at AMD.  Taylor was a marketing executive at Akamai, not in the chain of command of people who received the company's financial results in advance of announcements.  For reasons known presumably to the government, neither Ruiz nor Taylor have been charged.  If Ms. Chiesi had gone to trial, we would have focused on this apparent dichotomy — a tippee's culpability is derivative of the tipper's culpability, see Dirks v. SEC, 463 U.S. 646, 659 (1983), yet these two tippers have not even been charged.  Ms. Chiesi's guilty plea obviously moots any legal issue that might have existed, but if sentencing is supposed to reflect to some extent comparative degrees of culpability, the fact that two alleged sources have not been deemed culpable should mean something.

Hariri and Moffat were tippers, insiders who disclosed material non-public information.  As such, each violated his fiduciary obligation to his employer.  That breach of fiduciary obligation is usually deemed to be the most culpable conduct in the realm of insider trading.  In

---

[12]   New Castle's subsequent trades in IBM based on information from Moffat in 2009 did result in profits to New Castle.

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313 (1985), the Supreme Court wrote: "In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place." The Court continued: "Absent other culpable actions by a tippee that can fairly be said to outweigh these violations by insiders and broker-dealers, we do not believe that the tippee properly can be characterized as being of substantially equal culpability as his tippers." *Id.* at 314.

We submit that the sentence to be imposed on Ms. Chiesi should take into account the Supreme Court's recognition that the tippee's culpability is usually less than that of the tipper, the person who is violating a fiduciary obligation.

The third person sentenced, Mark Kurland, was a principal in the hedge fund known as New Castle. He had obtained his MBA in 1973 and began employment in the corporate world. In 1982 he entered the securities industry at a brokerage firm known as Mabon Nugent and quickly moved up the ranks. In 1988, fresh out of college, Danielle Chiesi began employment at Mabon Nugent as a junior institutional salesperson. She was 22 years old. Kurland was 40 years old. In 1990, Kurland moved to Bear Stearns as director of research, and by 1995 he was promoted to chairman and chief executive of the firm's asset management business. At that time, Bear Stearns approved Kurland's proposal to form New Castle Partners within the firm to manage a family of hedge funds. Kurland, along with Robert Reitzes, ran New Castle. In 1996, Ms. Chiesi came to work at New Castle. By then, she and Kurland had been in an intimate relationship for about three years, one which continued until October 16, 2009, the day of the arrests.

As the government wrote in its Sentencing Memorandum in advance of Kurland's sentence:

> "Here, Kurland was the boss.  Kurland had the power to fire
> Chiesi, to increase or decrease her role and authority at New
> Castle, and to set her compensation.  Kurland, not Chiesi,
> ultimately decided how big a position New Castle would take in
> the securities being bought and sold on the basis of Inside
> Information.  Moreover, Kurland had more to gain, personally,
> than any of the other participants in the offense conduct.  As the
> owner of 40% of New Castle, Kurland stood to benefit the most
> from the performance fee that New Castle captured on profitable
> trading (20%).  In addition, Kurland also stood to profit from his
> personal investment in New Castle.
>
> ". . . . Kurland participated proactively to ensure the criminal
> venture's success.  With respect to insider trading in AMD,
> Kurland was secretly hooked into a call with Moffat so that he
> could hear, directly, what Moffat was disclosing with respect to
> complicated financial terms of the deal.  Kurland analyzed that
> information and directed trading on the basis of his analysis, and
> he directed Chiesi to go back and pose specific questions regarding
> AMD's debt.  With respect to Akamai, Kurland proposed creating
> false documents to mask that trades were in fact based on Inside
> Information.  Chiesi followed Kurland's instruction and created
> such a document.  Thus, Kurland's participation was anything but
> passive.  Kurland was not just following directions; he was giving
> them."[13]

After observing that Kurland was a leader in the financial industry, Judge Marrero

sentenced him to a below-the-range term of 27 months imprisonment.  Danielle Chiesi's stature

in the financial industry hardly was that of Kurland's.  Given what the government itself has

acknowledged was Ms. Chiesi's subordinate role to Kurland's, it is difficult to fathom a rationale

justifying anything other than a lesser sentence for Ms. Chiesi.

While every case is different, it is also relevant to consider sentences imposed on other

defendants in insider-trading cases.  It is a frequent occurrence that insider-trading defendants

who plead guilty without cooperation agreements receive sentences below their respective

Guideline ranges.

---

[13]   Government's Sentencing Memorandum in *United States v. Kurland*, 10 Cr. 69 (VM), pp. 10-11.

The most recent was Alexei Koval, who, on May 24, 2011 was sentenced by Judge Crotty to 26 months imprisonment.[14]  The Guideline range was 30-37 months.  Koval's personal profit from the inside information was over $870,000.  Koval's co-defendant, Igor Poteroba, the tipper, was sentenced by Judge Crotty on March 22, 2011 to 22 months imprisonment.[15]  The Guideline range was 24-30 months.  Poteroba was paid at least $55,000 for the information he provided Koval.

Also very recent was Richard Hansen, who, on May 12, 2011, was sentenced by Judge Crotty to three months imprisonment and two years probation, with five months of that spent in home confinement.[16]  The Guidelines range was 10-16 months.  Hansen's personal profits from the inside information was approximately $60,000.

The following chart details eleven other such sentences below the Guidelines range (excluding Kurland and Hariri).  This chart was submitted to Your Honor by defense counsel in connection with the sentencing of Ali Hariri, and we incorporate it herein:

---

[14]    *United States v. Koval*, 10-cr-00443.

[15]    *United States v. Poteroba*, 10-cr-00649.

[16]    *United States v. Hansen*, 10-cr-00875.

| Name | Guidelines | Sentence imposed |
|---|---|---|
| Frederick Bowers | 12-18 months | 3 years probation |
| Ruopian Chen | 30-37 months | 18 months prison |
| Randi Collotta | 12-18 months | 60 days prison, 6 months home confinement |
| James Gansman[17] | 41-51 months | 12 months and 1 day prison |
| Robert Goehring | 10-16 months | 2 years probation, 5 months home detention |
| Eric Holzer | 12-18 months | 5 years probation, 270 days residential reentry center |
| Michael Koulouroudis | 18-24 months | 3 months prison, 3 months home confinement |
| John Marshall | 46-57 months | 18 months prison, 1 year home confinement |
| Ken Okada | 30-37 months | 3 years probation |
| George Paparrizos | 6-12 months | 3 years probation, 6 months home confinement |
| Xukia Wang | 30-37 months | 18 months prison |

* * * *

For all of the foregoing reasons, we respectfully submit that a sentence below the Guideline range and below the sentence imposed on Mark Kurland is "sufficient but not greater than necessary" to comply with the purposes set forth in § 3553(a)(2), and would reflect a just and compassionate result under all of the circumstances of the case and of the defendant Danielle Chiesi.

Dated: New York, New York
      June  13, 2011

KELLEY DRYE & WARREN LLP

By: _____
    Alan R. Kaufman
    James M. Keneally
    101 Park Avenue
    New York, NY  10178
    (212) 808-5195
    (212) 808-5018

---

[17]    Gansman went to trial.